[No. 29996.   Department One.   October 3, 1946.]

Oscar Mapes, *Appellant*, v. Santa Cruz Fruit Packing Corporation, *Respondent*.[1]

*Welts & Welts,* for appellant.

*Eggerman, Rosling & Williams* and *Joseph J. Lanza,* for respondent.

Schwellenbach, J.—This action was instituted to recover a claimed balance due for strawberries delivered by plaintiff and his son, James Mapes (who assigned his cause of action to plaintiff), to the defendant.

The plaintiff alleged that, during the season of 1943, he and his son delivered to defendant 246,312 pounds of strawberries, of the reasonable value of $36,946.80, for which they were paid $29,557.44, leaving a balance of $7,389.36 due and

[1] Reported in 173 P. (2d) 182.

unpaid. The defendant admitted the delivery of the straw-berries as alleged and the payments, but denied that there was any balance due. The defendant alleged affirmatively the existence of written contracts with the plaintiff and his son, which were set out in full. In an amended reply, the plaintiff alleged that, at the time the written instruments were executed, it was agreed between the parties that they should not come into force and effect unless the office of price administration passed a resolution preventing payment of a price of more than twelve cents a pound for the year 1943, and that no such rule or regulation came into being.

The cause was tried to a jury and resulted in a verdict in favor of the defendant. The plaintiff moved for judgment notwithstanding the verdict and, in the alternative, for a new trial, both of which motions were denied. From the judgment entered on the verdict, the plaintiff appeals.

The appellant claims error in the denial of his motion for a new trial, in entering judgment of dismissal, in the giving of a certain instruction, and in the admission of certain evidence.

Oscar Mapes and James Mapes live in the Skagit valley, and have been growing strawberries for some time. In 1943, they had about forty acres under cultivation. Representatives of the respondent company had contacted them in the latter part of 1942 in regard to obtaining their entire output in 1943. On February 3, 1943, Marvin Knoblauch, manager of the Kent plant for respondent company, and Earl Anderson, field representative, met the appellant and his son at the appellant's home. After a discussion, identical contracts were signed by the father and the son. As to price, the contracts recited:

"Price to be *the average price paid in the Pacific Northwest during the Season 1943 for like quality and grade* for the 1943 Season 12¢ per lb." (Italicized words crossed out in original.)

The form contracts had been prepared before and, in their presence, Mr. Anderson crossed out the words as indicated above and wrote in longhand the words "for the 1943 Season 12¢ per lb."

The contracts also provided:

"This contract is intended and understood by both parties to pass title to said Berries and to constitute an absolute sale, but until delivery has been completed Seller agrees to and does assume all risk of loss, depreciation or damage to undelivered Berries. . . .

"No failure or omission on the part of the Buyer to insist upon or enforce any of the terms, agreements or conditions of this contract for one or more breaches on the part of the Seller, shall be deemed a waiver on the part of the Buyer, unless the same shall have been made in writing. No representative or agent of the Buyer shall have any authority to waive, change or add to any of the terms or conditions specified herein except by a writing duly executed."

As to the question of price, Oscar Mapes testified:

"Well, they brought a contract and wanted us to sign the contract. There has been no price talked about before, but in that contract it was twelve cents. We asked them what the twelve cents was for. They said, 'If the O. P. A. limits us to twelve cents that is what we will pay. If not, this contract will not go into effect and we will pay whatever other companies pay.' "

James Mapes testified:

"They brought out a contract, and in this contract that I read over I noticed there was twelve cents a pound written in, so I asked Anderson what the twelve cents meant. He says, 'It only means one thing, if the O. P. A. limits us to twelve cents a pound to what we can pay the grower, that is what you will be paid. If they don't limit us to twelve cents a pound to the grower this contract won't come into effect and we will pay you as much as any other company.' I said, 'That sounds good to me.' And so I signed the contract."

Earl Anderson testified:

"A. I asked Mapes—James and Oscar Mapes, whether they had decided whether they would let Santa Cruz have their total crop of berries for the year 1943, and they said yes, they had. They brought up the fact since limitations might be put on prices and there hadn't been anything out as to what the berry price was, I told them that it was still in agreement that they would have the same as any other company paid if they would give us their total amount of berries. They said that was the only question they wanted

answered, and if that was what the situation was they would give us their total berries.

"Q. Then what happened, did you write some kind of an instrument? A. I wrote a contract and I put in twelve cents and handed it to them to sign, and before signing they asked about that twelve cents. I had been notified by my company that they had been notified that that was the price that the grower would get, by the Government, and I thought that should be put in the contract for them, but they immediately raised the question, how about if any other company pays more? I immediately told them that if the Government allowed, or anybody allowed any other company to pay more for those berries, we would do exactly the same thing, but under the present situation that twelve cents was what we thought at that time, or I had been notified was the price to put in that contract. So they stated that with the agreement that if any other company would pay more, therefore if the Santa Cruz would be allowed to pay more they would get it, and they signed the contract.

. . .

"Q. What was then said by you when they asked about this written contract going into effect at twelve cents? A. I told them when they questioned the twelve cents, that if any other packer paid above the twelve cents and that Santa Cruz Packing Company would be allowed to do the same and they would get it, and that twelve cents in there would be absolutely—would not mean anything, and that they would get that additional money for their berries, and the agreement would not be in effect. Q. And you say it was with that understanding they signed the agreement? A. That is true."

Shortly after this, Mr. Anderson was transferred to Bellingham by the respondent, and he left its employ November 1, 1944. Under cross-examination, he testified that he drew the lines through the contracts as indicated above before the Mapes signed them, and that they noticed him doing it.

On the other hand, Mr. Knoblauch testified as follows regarding the price:

"A. Mr. Anderson and myself drove up to the Mapes residence and we made a call which undoubtedly is known as regarding the purchase of strawberries, and a general conversation for a few moments, maybe a little longer, before

we entered into talking of strawberries. Mr. Anderson, I believe, was handling the contract, and the question arose regarding the purchase of strawberries, and a general con- · their home what the happenings had been from our last instructions were—in other words, as to the price we were permitted to pay as to the support price. Q. What did you tell them? A. I told them that we were permitted to pay as to the support price, our permission would be twelve cents. Q. Did you give them any other option? A. They knew the contract practically as well as we do. They have had the other option in past years.

"Q. What was that option? A. Either accept the actual price on the contract, or be paid the average price that was paid in the Pacific Northwest. Q. If they would have accepted that latter option of the average price, how would they be paid during the season? A. They would be paid their advance during the season, and the average would be taken of other packers, and they would receive returns on that basis. Q. How would the advance be computed? A. By what is written on the contract. Q. Would you have that specifically recited that they were to receive any advance? A. Beg pardon? Q. If they signed an average price clause contract, would the contract have the amount that they were to be advanced during the season? A. Yes.

"Q. Was that explained to the Mapes, that they could have their option of either signing the average price, or taking a flat price of twelve cents—was that discussed with them? A. Yes, it was. It was discussed with them that they could have the average price that they had the year before, or they could take the twelve cent support price that we were permitted to pay. Q. What did they say with reference to that? A. They decided at that time that they would not take the average price, that they would take the twelve cent support price; and, to my recollection, if there was an increase in the support price allowed to the packer they would benefit by the same."

The appellant and his son had entered into written contracts with the respondent in 1941 and 1942. The 1941 contract provided:

"Price to be (.05 cents per pound) *the average price paid in the Pacific Northwest during* the Season 1941 for like quality and grade." (Italicized words crossed out in original.)

The 1942 contract provided:

"Price to be (Six cents per pound) advance the average price paid in the Pacific Northwest during the Season 1942 for like quality and grade."

In this contract, the appellant insisted that the provision for average price be left in, and also insisted that the word "advance," following "(Six cents per pound)," be added.

The strawberries were delivered in June and July of 1943. Each week there would be forwarded to the growers a statement showing the date of delivery, number of boxes, weight, at the rate of twelve cents a pound, and amount due. Accompanying each statement was a check corresponding with the amount.

Oscar Mapes received the following checks:

| | | |
|---|---|---|
| June 16, 1943 | $  302.88 | |
| June 23, 1943 | 5,184.48 | |
| June 28, 1943 | 6,164.04 | |
| July   3, 1943 | 5,433.48 | |
| July 14, 1943 | 2,464.68 | $19,549.56 |

James Mapes received similar checks on the same dates, totaling $10,007.88. The checks were endorsed and deposited in the bank by the parties as soon as received. So far as the record shows, nothing further transpired between the parties until the spring of 1944, when the appellant and his son, having learned that other processors doing business in the area had paid an additional three cents a pound to growers dealing with them (these additional payments were made in 1944), wrote the following letter to the respondent:

"Santa Cruz Packing Co.,                         Burlington, Wash.,
"Oakland, California.                               May 24, 1944.
"Mr. K. E. Eberts
"Dear Sir:

"I wrote to Mr. Marvin Knaublauch [Knoblauch] some six weeks ago concerning our strawberry crop for 1943. Up to the present time he has not answered my letter.

"You are familiar with the 1943 contract of 12¢ which was the ceiling price at that time. In the past two months six of the Companies which buy berries have paid an additional three cents on the 1943 crop. The Companies are: R. D. **Bodle** Co., National Fruit Canning Co., S. A. Moffett, Cascade

Frozen Foods, Hershey Canning Co., and Bozeman's Canning Co.

"At the time the contract was drawn up and signed the question was raised: If the ceiling price is raised would the grower receive any additional money. Marvin and Earl both agreed to such a proposal in the presence of my wife and son.

"On May 22 I called Earl Anderson and he has advised me to write to you and explain the situation. I had 81 tons of berries and Jim had 41 tons.

"We feel we should be entitled to this additional three cents on the 1943 crop.        Very sincerely yours,

"Oscar Mapes

"James Mapes"

Not obtaining a satisfactory response to the letter, this lawsuit resulted.

For the reason that we feel that the trial court should have sustained the respondent's challenge to the sufficiency of the evidence at the close of the case, because of the parol evidence rule, we shall not discuss the errors claimed by the appellant.

██   No citation of authorities is necessary to justify the well-established rule that parol evidence is not admissible to vary the terms of a written instrument. An exception to this rule has been recognized permitting parol evidence to show the conditional delivery of the writing. In other words, it may be shown by parol that a written instrument would not be in effect as an obligation of the parties unless certain other events had transpired. This doctrine was recognized and applied in the case of *Reiner v. Crawford*, 23 Wash. 669, 63 Pac. 516, 83 Am. St. 848.

That case was an action for damages for failure to comply with the terms of a written contract to deliver stock. The defense was that it had been delivered upon the express understanding that it was not to take effect if the defendant's agent at Spokane had sold the stock, or entered into a contract for the sale of the same, prior to the time the plaintiff would reach Spokane and notify the agent of the contract of purchase. The agent had in fact contracted to sell the stock on the day preceding the execution of the writing sued on, and the shares of stock were delivered to the purchaser

prior to the time the plaintiff reached Spokane. In that case, we held:

"On the trial the court permitted the respondent, over the objection of the appellant, to prove by oral evidence the conditional delivery of the writing. This is assigned as error, being, it is contended, in violation of the rule that parol evidence is inadmissible to contradict or vary the terms of a written instrument. But we think the rule invoked is not applicable to the question here suggested. To show that a writing in the form of a contract was delivered to take effect on the happening or the not happening of a condition, and that the condition on which it was made to depend has happened or has not happened, as the case may be, does not in any true sense contradict the terms of the writing or vary their legal import, but is, rather, the showing of a separate agreement constituting a condition precedent to the attaching of any obligation under the writing. In other words, while parol evidence is inadmissible to vary or contradict the terms of a written instrument, such evidence is admissible to show that a writing in the form of a contract never became operative as a contract."

Can it be said, from the evidence in this case, that the writings executed by the parties on February 3, 1943, never became operative as contracts. The strawberries were delivered to the respondent by the appellant and his son, as they had agreed in writing to do. And the respondent paid the appellant and his son, as such deliveries were made, at the rate of twelve cents a pound, as the respondent had agreed in writing to do. Clearly, this parol testimony, introduced by the appellant over the objection of the respondent, contradicted the terms of the writings and varied their legal import.

*Bergman v. Evans,* 92 Wash. 158, 158 Pac. 961, Ann. Cas. 1918C, 848, was an action to compel payment of balances due on written stock subscriptions. The answer alleged that the shares of stock had been subscribed under an express agreement that no more of the subscriptions should ever be paid than the sums already received by the defendants. We there held, p. 167:

"The next contention is that the evidence discloses an agreement among the appellants and respondent that no

assessment would ever be levied upon the unpaid stock and that appellants would never be required to pay any more than the sums already paid. We are satisfied that the preponderance of evidence is against this contention. But, in our view, evidence tending to show such an agreement is inadmissible, since it would be to permit parol evidence of a contemporaneous oral agreement to vary the terms of a written contract. The subscription contract recites that the subscribers each 'agree to pay for the number of shares of said stock set opposite our respective names.' . . .

"All oral agreements, whether prior or contemporaneous, are merged in a subscription contract which has been reduced to writing and signed, and parol evidence is inadmissible to vary its legal import by showing that a subscription was conditional."

*Whitman Realty & Inv. Co. v. Day,* 161 Wash. 72, 296 Pac. 171, was an action on a promissory note given by Day to the Farmers National Bank of Colfax, which, for a valuable consideration, had been endorsed to the plaintiff. We there said, p. 79:

"At the trial, appellant undertook to prove the collateral oral agreement which he alleged was made contemporaneous with the execution of the initial note of April 4, 1923. This proffered proof, the court rejected, and properly so. His own testimony established that the agreement depended on a condition subsequent. If a contemporaneous oral agreement, depending on the happening of a condition subsequent, could defeat recovery on a note, the rule which provides that a written instrument cannot be varied by parol evidence, would be abolished. This question has been frequently before this court:

" 'That a collateral oral agreement limiting the liability of the maker of an unqualified promise to pay, or fixing a collateral source of payment, is not available as a defense is now well settled by our own decisions.' *Van Tassel v. McGrail,* 93 Wash. 380, 160 Pac. 1053."

*McDonald v. Wyant,* 167 Wash. 49, 8 P. (2d) 428, was an action to enforce payment of a real estate broker's commission. We there said, p. 52:

"The written promise of Wyant on March 27, 1929, to pay Blair six hundred dollars was an unconditional promise. The court erred in admitting the testimony as to the prior or

contemporaneous oral agreement which depended upon a condition subsequent—the cutting and marketing of the timber. The written instrument is free from ambiguity, and respondent does not claim there was any fraud or mistake, hence parol evidence of prior or contemporaneous agreements is inadmissible to show the intention of the parties were different from what is expressed in the writing. . . .

"The writing signed by Blair, evidencing receipt by the broker of one hundred dollars from respondent, recites that the balance of five hundred dollars due to the broker was 'to be paid at the rate of one dollar per M. as logging is done.' That receipt, the same as the contract, 'cannot be controlled by parol evidence, so far as it operates as a contract, any further than ordinary contracts may be.' 10 R. C. L. 1026.

"There is no evidence, other than respondent's testimony, that Blair agreed to make the payment of his commission dependent upon the ability of respondent to collect the purchase price of the land and the personalty thereon from the vendee as he cut and marketed the logs."

A further exception to the parol evidence rule is found in 1 Restatement of the Law of Contracts 340, § 241, as follows:

"Where parties to a writing which purports to be an integration of a contract between them orally agree, before or contemporaneously with the making of the writing, that it shall not become binding until a future day or until the happening of a future event, the oral agreement is operative if there is nothing in the writing inconsistent therewith."

As an illustration under that section, the following is given:

"1. A and B make and sign a writing in which A promises to sell and B promises to buy goods of a certain description at a stated price. The parties at the same time orally agree that the writing shall not take effect unless within ten days their local railroad has cars available for shipping the goods. The oral agreement is operative according to its terms. If, however, the writing provides 'delivery shall be made within thirty days' from the date of the writing, the oral agreement is inoperative."

See, also, note in 70 A. L. R. at p. 756.

■ In the final analysis, the question always resolves itself down to this: Does the parol testimony actually vary

or change the terms of a written contract? If it does, it is not admissible. However, if, contemporaneously with the execution of a writing, the parties entered into a distinct, collateral contract, which had not been reduced to writing, such contract may be proved by parol testimony so long as such evidence is not inconsistent with, and does not contradict, the writing.

Applying the foregoing test to the facts in this case, clearly, testimony to the effect that, if the office of price administration would not limit the company to the twelve cents a pound paid to the growers, the contracts would not be effective, but the respondent company would pay the Mapes as much as would be paid by any other company in that area, was inconsistent with, and did contradict, the writings, which definitely and unambiguously stated the price at twelve cents. This parol testimony should have been stricken, and respondent's challenge to the sufficiency of the evidence and motion for judgment of dismissal, granted.

Judgment affirmed.

BEALS, C. J., MILLARD, ROBINSON, and JEFFERS, JJ., concur.