[No. 32561. Department Two. April 29, 1954.]

WASHINGTON FISH & OYSTER CO., INC., *et al., Respondents*, v. G. P. HALFERTY & CO., INC., *Appellant*.[1]

[1] Reported in 269 P. (2d) 806.

648

*Jones, Birdseye & Grey,* for appellant.

*Evans, McLaren, Lane, Powell & Beeks,* for respondents.

FINLEY, J.—Washington Fish & Oyster Co., Inc., brought this action to recover an amount of money alleged to be due under two contracts with G. P. Halferty & Co., Inc. So far as the merits of the controversy are concerned, the principal issue presented, both in the trial court and on appeal, is whether the contracts sued upon were contracts for an outright sale of canned salmon to Halferty Co. or contracts which created an agency relationship between the parties, whereby G. P. Halferty & Co., Inc., was a selling agent or a broker for respondent.

Washington Fish & Oyster Co., Inc., is a large fish-packing concern in Seattle. The company (hereinafter referred to as Washington Fish) has a selling organization, which disposes of a large percentage of its products. G. P. Halferty & Co., Inc. (hereinafter referred to as Halferty), operates as a fish brokerage company and, in addition, has its own extensive business of packing canned salmon and other seafoods, and, in the terms of the trade, takes a position in the canned-salmon market, often buying from others out-

right on its own account without necessarily having orders on hand.

In the latter part of February, 1951, Claude H. Angstead, then employed in the sales department of Halferty, telephoned Washington Fish. Speaking with Norman Weitkamp (vice-president of Washington Fish), he requested that company to supply Halferty with one thousand cases of "Chum" salmon, at twenty dollars a case, this being the general market price at the time. Mr. Angstead further requested that the Halferty labels be placed on the cans, and that the salmon be shipped pursuant to future shipping instructions from Halferty.

On February 27, 1951, Halferty confirmed this order on a written mimeographed form, signed by Mr. Angstead for G. P. Halferty & Co., Inc.

Early in March of 1951, another transaction took place and was identical to the transaction of February, 1951, except that seven thousand cases of salmon were requested by Halferty. Again, Halferty confirmed the arrangement by a written mimeographed form. These forms will be referred to herein as contracts, although counsel for Halferty argues that they are not. Subsequently, one thousand cases of the second order were canceled by mutual agreement of both companies. At the time the two orders were placed early in 1951, the market for canned "Chum" salmon was active and firm at the market price of twenty dollars a case. Halferty had orders for about one half of the total number of cases ordered from Washington Fish, and anticipated orders for the remainder. There was at the time an O.P.S. ceiling price of twenty dollars per case. As previously stated, the two form contracts, signed and mailed by Halferty to confirm the purchases, are identical except for the quantities involved. The mimeographed form is set out herein at a later point.

In accordance with the agreement, Halferty sent to Washington Fish, at various dates, written labeling and shipping instructions, indicating the quantity of salmon to be shipped, the dates for delivery, and shipping destinations. Before the end of April, 1951, all of the salmon had been shipped

pursuant to Halferty's instructions. From time to time, Halferty sent checks to Washington Fish as payments on the account. Only two relatively small deliveries of salmon were paid for by banker's collection order as provided in the contracts.

In the latter part of September, 1951, Washington Fish requested payment of the balance then due on the Halferty account. Officers from the two companies conferred on September 25th, at which time Halferty delivered a statement entitled, "Accounting of Salmon Stock Consigned." This statement itemized the cases of salmon sold by Halferty and the prices received. Some had been sold for $20 a case; some for $18 and $16 a case. According to the statement, 2,186 of the total number of cases shipped by Washington Fish still remained unsold by Halferty. At the September 25th meeting, William Jensen, president of Washington Fish, disclosed that his company did not own the canned salmon involved in the transaction. (Subsequently, in a deposition taken by the attorney for Halferty, William Jensen revealed that Washington Fish was an agent for British Columbia Packers, Ltd., of Vancouver, B. C., and that the latter company owned the salmon and had authorized Washington Fish to pack and to sell it.) Mr. Jensen requested that payment of the account be made at once. The Halferty representatives took the position that, under the contract, Halferty was a sales agent and was obligated to pay for the salmon only as it was sold by Halferty. Mr. Jensen suggested that Halferty offer to make immediate settlement on the basis of twenty dollars per case for all the cases actually sold at that price; and eighteen dollars a case for the remainder. Mr. Jensen stated that, if such an offer was made by Halferty, he would communicate it to Washington Fish's principal, the British Columbia Packers, Ltd. Halferty declined to make such an offer. On October 5, 1951, Halferty sent a check for $65,847.60 to Washington Fish. Enclosed with the check was a statement showing Halferty's itemization of the account and the amount Halferty claimed was owed to Washington Fish.

Washington Fish consulted its attorneys, and on October 8, 1951, had the check certified. On October 11th, the attorneys for Washington Fish wrote to Halferty, advising that the check was not accepted in full payment but would be held until the matter was finally determined. They further asserted that Washington Fish claimed $17,257.01 as the amount still due on the account.

On October 15, 1951, Halferty replied in writing, reasserting that it had acted only in the capacity of a selling agent. Shortly thereafter, this action was brought by Washington Fish. From a judgment rendered in favor of Washington Fish, Halferty has appealed.

■ Appellant first assigns error to the trial court's sustaining of demurrers to two affirmative defenses contained in its original answer. The appellant, having elected to plead over rather than stand on its original answer, waived any objection to the ruling of the court in sustaining the demurrers. Application of the procedural principle here involved usually occurs in connection with a demurrer to a complaint. *Goshert v. Wirth,* 130 Wash. 14, 226 Pac. 124; *Noble v. Martin,* 191 Wash. 39, 70 P. (2d) 1064; *Port of Seattle v. Fidelity & Deposit Co.,* 185 Wash. 247, 53 P. (2d) 740. However, the procedural principle is applicable where the pleading to which the demurrer is sustained is an affirmative defense. *Sunset Motor Co. v. Woodruff,* 130 Wash. 516, 228 Pac. 519.

■ Appellant's second assignment of error attacks the trial court's sustaining of a demurrer to its third affirmative defense, contained in its amended answer, which attempted to set out an accord and satisfaction. Assuming this was error, we agree with respondent that there was no prejudice, inasmuch as the trial court admitted all of appellant's evidence on this issue and, in effect, disregarded the fact that the demurrer had been sustained. The issue of accord and satisfaction will be discussed subsequently.

After the trial had commenced, appellant moved that the case be dismissed on the ground that the plaintiff therein was not the real party in interest; and that Washington Fish

had no pecuniary interest in the outcome of the case, but was merely an agent of British Columbia Packers, Ltd., owner of the salmon. The motion was denied, but the trial court on its own motion made the British Columbia Packers, Ltd., an additional party-plaintiff. This action was consented to by British Columbia Packers, Ltd.

■ Appellant has assigned error to the court's refusal to dismiss the action. At the trial, the appellant argued, in support of its motion, that, by joining British Columbia Packers after the trial had commenced, the court had deprived it of the valuable right of removal to a Federal court. This argument was again made in appellant's opening brief. Respondent has correctly pointed out that, under 28 U. S. C. A., § 1441 (b), such a right to removal does not exist unless "none of the parties in interest, properly joined and served as defendants, is a citizen of the State in which such action is brought." See, also, 1 Barron and Holtzoff, Federal Practice and Procedure 179, § 103.

■ In its reply brief, appellant concedes that it has no right to removal to a Federal court, but, for the first time, offers additional arguments why the joinder of the new party-plaintiff was prejudicial. We find no merit in the arguments, and, since these contentions have been made for the first time in the reply brief, we will not consider them. *Turner v. Department of Labor & Industries*, 41 Wn. (2d) 739, 251 P. (2d) 883; *Schrock v. Gillingham*, 36 Wn. (2d) 419, 219 P. (2d) 92.

■ The action of the trial court in joining the additional plaintiff was proper and was clearly authorized by Rule of Pleading, Practice, and Procedure 2 (3), 34A Wn. (2d) 69, which provides:

"(3) No action or proceeding shall be defeated by the nonjoinder or misjoinder of parties. New parties may be added or substituted and parties misjoined may be dropped by order of the court at any stage of the cause, as the ends of justice may require."

See, also, *Toulouse v. New York Life Ins. Co.*, 39 Wn. (2d) 439, 235 P. (2d) 1003.

■ Most of appellant's remaining assignments attack the trial court's findings of fact. As a preliminary to our own consideration of these assignments, it is necessary to discuss respondent's contention that such assignments are insufficient to permit a review under Rule on Appeal 43, 34A Wn. (2d) 47, as amended, effective January 2, 1953. Appellant, in its assignments, sets out the several findings verbatim and in their entirety. Several of the findings are long and contain detailed statements of facts, many of which are not controverted. Appellant failed to specify which portions of the findings it objected to. Our review has been made more difficult by this failure, and, in cases involving such detailed findings, we cannot commend this method of assigning error. However, we are convinced that appellant did attempt to comply with the rule and that the assignments, as made, together with the argument in appellant's brief, sufficiently advise respondent's counsel and this court of the specific findings which appellant intended to attack. We will not review the remaining assignments of error individually, but will instead discuss the issues raised thereby.

The trial court permitted the appellant to introduce evidence relative to an alleged accord and satisfaction, supposedly brought about by the payment and receipt of the check of October 5, 1951, mentioned above. However, at the conclusion of the trial, the court found:

"That said check was not accepted by the plaintiff or additional plaintiff in full payment of said account and that defendant was given adequate notice thereof. That the two essential elements for the defense of accord and satisfaction are missing and not proven by the defendant, namely, (a) a meeting of the minds of the parties to the action, and (b) any consideration."

We shall discuss only the question of meeting of the minds of the parties—or, stated differently, whether the check was accepted as full payment of the account. It will be recalled that, at the September 25th conference, a sharp dispute existed as to the amount owed by Halferty on its two accounts with Washington Fish. On October 5, Halferty mailed its check for $65,847.60, together with its final ac-

counting statement, entitled, "G. P. Halferty & Co. Account Sales for Account of Washington Fish & Oyster Co." The statement sets forth the number of cases of salmon sold at twenty dollars, previously paid for; the number of cases sold at twenty dollars, with the amount still due to Washington Fish therefor; and the number of cases sold at sixteen dollars, with the amount due to Washington Fish therefor. From the total amount due, there are subtracted certain discounts allowed under the written contracts. The final entry contains the following words and figures: "BALANCE—CHECK HEREWITH: $65,847.60".

Appellant contends that, when Washington Fish accepted the check by having it certified, there was an accord and satisfaction. Both sides to the controversy have cited numerous cases bearing generally on the law of accord and satisfaction and, specifically, on what may constitute a meeting of the minds of a debtor and a creditor when the debtor pays and the creditor accepts a sum less than the full amount due. No case cited to us, however, is as closely in point and as helpful as the very recent decision of *Boyd-Conlee Co. v. Gillingham, ante* p. 152, 266 P. (2d) 339. In that case, a dispute as to the amount due under a contract arose. The parties met to discuss the account but separated in sharp disagreement. Shortly thereafter, the creditor received a check for less than the amount it claimed was due. The check was cashed and the proceeds credited to the account. A statement accompanying the check contained the debtor's version of the amount due. Appearing on the statement, following the debtor's tabulations, was this final item: "Balance to you $5,893.63." This was the amount of the check. In that case we held:

"The mere receipt by respondent of an amount less than is claimed, with the knowledge that appellants admit an indebtedness only to the extent of the payment made, does not of itself establish an accord and satisfaction. When a remittance is made, which is less than the amount in dispute, it must be made plain to the creditor that the remittance is tendered as full payment of the disputed amount. If it is so accepted, then there is an accord, and the remittance discharges the entire obligation. *Three Rivers Growers' Ass'n*

*v. Pacific Fruit & Produce Co.,* 159 Wash. 572, 294 Pac. 233 (1930); Restatement, Contracts, § 420, Comment (a) Illustration 5.

"The facts of the instant case do not meet this test. As we said in *Ingram v. Sauset,* 121 Wash. 444, 447, 209 Pac. 699, 34 A. L. R. 1031 (1922):

"'The fallacy of appellants' position lies in this: first, whatever Sauset's intention, the check was not offered in full satisfaction of the demand, though respondent thought that Sauset intended or hoped it would be so accepted; no conditions accompanied it and there was nothing to indicate that it might not, in the event that the payee declined to accept it as full payment, be applied on account and further negotiations be had as to the remainder of the claim. Second, there is nothing in the record to indicate that respondent accepted the check as full payment.'

"Appellants' obligation was not discharged by an accord and satisfaction."

We are convinced that the *Boyd-Conlee* case is controlling, and that, in the instant case, there was nothing contained in the accounting statement that could reasonably be said to place respondent on notice that the check was tendered on the condition that acceptance thereof would discharge the entire debt.

There was a voucher or stub attached to the check. At its top are printed the words: "The attached check is in settlement of the following accounts." This is a form voucher apparently attached to all Halferty checks, including those previously sent to Washington Fish as partial payments for salmon. In this case, we believe the accounting statement accompanying the check, with its detailed breakdown of fish sold, amounts previously paid, and generally, its complete explanation of the amount tendered in the form of the check, must be looked to in order to discover if there was notice to respondent, and inferentially, an agreement by it, that, upon its acceptance of the check, there would be an accord and satisfaction of the entire debt. As we stated above, we find no such notice.

The trial court found that the two contracts in question were for an outright sale of seven thousand cases of salmon to Halferty; also, that the contracts were not only unam-

biguous but that the evidence in the case generally supported the conclusion that the contracts were for an outright sale of salmon from Washington Fish to Halferty, rather than a brokerage arrangement. These findings of fact are strongly attacked by appellant. It contends that only an agency relationship was established.

The contract of February 27, 1951, is here set forth:

"Washington Fish & Oyster Co. February
 Pier 54 27th
 Seattle 4, Washington 1951

"Gentlemen:

"This is to confirm your confirmation of sale of the following Canned Salmon:

"QUANTITY: 1000 Cs. 48/#1 Tall Alaska Chum Salmon (Average to BTA)

"PRICE: $20.00 per case.

"Less: 1/10 of 1% in lieu of normal swell claims.
 1-½% and 5%
 $1.90 per M label allowance.
 Labels placed free or,
 10-½% per case labor allowance.

"*Price Guarantee:*

"TERMS: F.O.B. outgoing cars or steamers, Seattle, Wash. Accepted Bankers Collection order against our draft, payable on arrival shipment at destination, will be delivered to you at time of shipment.

"REMARKS: Confirming telephone 2/27/1951.

"Confirmation as indicated herein and release for shipment, it is understood, also carries your guarantee that the foregoing merchandise conforms to the requirements of all Pure Food Laws, both Federal and State and amendments thereto.

 "Yours sincerely,
 "G. P. HALFERTY & Co.

"CHA: amp "By [Signed] C. H. Angstead"

Except for the quantity of salmon, the March 8, 1951, contract is identical.

Appellant tacitly admits that on their face these writings do not establish a brokerage arrangement. It is argued, however, that they do not constitute written contracts within the parol evidence rule; hence, *terms* and *meaning* may be supplied by parol evidence, and that, notwithstanding

the findings of the trial court, parol evidence was properly admitted and should be considered by this court. Appellant argues in support of its position that the forms are informal, incomplete, and are signed by one party, only.

We are of the opinion that these arguments were adequately answered by this court in *Asbury v. Yakima Milling Co.*, 137 Wash. 203, 242 Pac. 362. In that case, one Asbury, who had purchased hay from the Yakima Milling Company, sent the following written contract:

"Yakima Milling Co. "Toppenish, Wn.
"Yakima, Wn. Feb'y 26, 1923.
"Gentlemen:

"I confirm purchase of you today of 5 cars 93% pure 1st cut. Alf at $21.00 per ton FOB track Ashue Wn. for loading prompt.

"This confirms our conversation in my office at Toppenish, also phone call to you of this evening.

.Accepted by Yours very truly,
_____ (Signed) H. M. Asbury"

In the *Asbury* case, the trial court admitted parol evidence to vary the terms of the written contract. Upon appeal, this court said:

"That presents a question of whether or no the written contract was complete in itself and so far free from ambiguity as to come within the rule. Respondent, while admitting the rule generally, seems to contend that, to come within the rule, the writing must not only on its face express a complete agreement, but also must show evidence of careful preparation and a due consideration of all questions which might naturally arise out of the subject-matter. It should be noted, before we go further, that here no question is raised because the contract was not signed by the seller, and it is admitted that the seller became bound by the writing (so far as it goes) by acting upon it and delivering the hay, to the same extent as though it had affixed its signature thereto. There may be, and doubtless are, courts which have adopted the broad rule for which respondent contends; but that is not the rule of this state. Here we have a writing complete as to every essential of a contract,—parties, subject-matter, price, time and place of delivery. The reference therein to prior conversations is not a reference to them for terms or conditions, but ex-

pressly for confirmation of all such conversations which have gone before, and plainly means that all prior parol negotiations and agreements are merged in and limited to the written conditions expressed. As such, under a long line of decisions of this court, it is a written contract, such as may not be varied by parol evidence."

See, also, *Fairbanks Steam Shovel Co. v. Holt & Jeffery,* 79 Wash. 361, 140 Pac. 394.

■ Considering the principles announced in the *Asbury* case, we believe that the documents executed by Halferty are contracts in writing, within the parol evidence rule, and may not be controlled, varied, or contradicted by parol evidence in so far as the terms of such contracts are unambiguous. In other words, the argument is without merit, that there were no contracts in writing within the parol evidence rule.

Appellant Halferty next contends that the contracts are in *certain respects* ambiguous, and parol evidence may therefore be considered to ascertain the *true meaning* of the parties. Specifically, the following language is said to be ambiguous:

"This is to confirm your confirmation of sale of the following canned salmon: . . . "

It is argued that, although there is reference to a sale, nowhere does it appear that the sale was to G. P. Halferty & Co., the signer of the contract. In order more clearly to establish its contention that the contracts are ambiguous, appellant introduced testimony of other brokers. The substance of this evidence and rebuttal testimony offered by respondent was that the contracts were ambiguous and did not clearly set out a sale or a brokerage contract. These opinions were, of course, mere legal conclusions and carry no weight in our determination.

■ But such evidence may not be considered for another and even more fundamental reason. We said in *Van Doren Roofing & Cornice Co. v. Guardian Cas. & Guaranty Co.,* 99 Wash. 68, 168 Pac. 1124:

"The rule is universal that the written contract itself must be resorted to as the source of authority for receiving

parol evidence. Parol evidence is never admissible to create an ambiguity, but only to explain or remove an ambiguity apparent on the face of the instrument, or to identify a subject-matter otherwise uncertain."

It is the function of the court to examine a contract to determine whether it is either so ambiguous or incomplete as to admit of parol evidence to ascertain the intent of the parties.

A careful analysis of the phrasing indicates to us that these were contracts of sale and nothing else. The important words are: "This is to confirm your confirmation of sale of the following canned salmon: . . ." The contracts were addressed to Washington Fish & Oyster Co., Inc., and were signed G. P. Halferty & Co., by C. H. Angstead. The parties to the contract could be none other than the addressee and the signer. We understand the quoted words to mean: We, G. P. Halferty & Co., intend this written contract to confirm and incorporate your agreement to sell certain canned salmon under the following terms. The term "sale," as used in the contracts, can have no meaning unless it means a sale to the signer, G. P. Halferty & Co., Inc., and we think this is exactly what it does mean. There was no error in the trial court's finding of fact No. IV (nor in its similar finding of fact No. V, pertaining to the second contract):

"That regarding plaintiff's First Cause of Action plaintiff, Washington Fish & Oyster Co., Inc., and the defendant on or about February 27, 1951, entered into a contract by which the plaintiff agreed to sell to the defendant and the defendant agreed to purchase from the plaintiff 1000 cases of 48 #1 Tall cans of Chum Salmon at a price of $20.00 per case less 1/10th of 1% in lieu of normal swell claims, . . ."

It may perhaps be true, as is sometimes argued, that the parol evidence rule often works hardship and injustice by defeating the true intent of the parties. However that may be, we do not conceive this to be the case here. On the contrary, this case is an illustration of the soundness of the reason given for the rule—that the writing still remains the best evidence of the understanding of the parties and of the

terms by which they intended to bind themselves. The parol evidence of the parties admitted by the court was either conflicting or confusing as to the intent of the parties.

Much of appellant's evidence was intended to show the customs and usages of the canned salmon industry. Yet his own expert witnesses testified that custom and usage in the industry were extremely flexible and varied from time to time. This is well borne out by a consideration of the entire testimony. After a careful review of the record, we are obliged to agree with the trial court's finding No. VIII, which, in part, reads:

"That although the evidence and testimony relative to customs and usages among canners and brokers of salmon in Seattle is somewhat conflicting, the defendant has failed to establish its contention relative to sale and brokerage contracts and customs and usages pertaining to the salmon industry, . . ."

■■■ There remain two terms of the contracts which are ambiguous and require explanation by parol evidence. We refer to the discounts of 1½% and 5%. The trial court found that the five per cent discount is commonly given where sales of salmon are made between brokers or packers in Seattle, and the evidence supports this finding.

It is respondent's position that, in contracts of this kind, the one and one-half per cent discount is granted where payment is made within ten days, and the trial court so found. The evidence clearly preponderates against this finding. Respondent's own officers testified that, although at one time this discount was granted for cash in ten days, it had become a trade discount given in all sales, irrespective of time of payment. Appellant is entitled to the one and one-half per cent discount on the sales.

Appellant has also pointed out an arithmetical error of $104.93 in the trial court's computation of damages. The error is in respondent's favor, and appellant should receive credit for this amount.

Finally, appellant challenges the computation of interest as determined by the trial court. The contracts, in effect, provided that payments would become due upon the arrival

at destination of the various shipments of salmon. Respondent proved the dates of shipment but did not prove the dates of arrival. The salmon in question was all shipped between March 27th and April 27th. Under the trial court's computation, interest on the amount due from each shipment began to run on April 27th.

 It is the law in this state that, in the absence of any contract to the contrary, interest on money becomes due and payable only when the money becomes due and payable. *Herzog v. Herzog*, 23 Wn. (2d) 382, 161 P. (2d) 142. In this case, however, the arrival time of the various shipments is not shown, and, accordingly, there was a failure of proof of the time the amounts became due. The trial court erred in computing the interest arbitrarily from the date of the last shipment from Seattle.

 Since the respondent failed to prove when the amounts became due, interest should be computed from the date demand was made for payment on September 25, 1951. At that date, all the shipments had long since arrived at their destinations.

The respondent will recover taxable costs and disbursements in this court.

The case is remanded to the trial court with instructions to modify the judgment in accordance with the views expressed herein.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and OLSON, JJ., concur.

---

July 27, 1954. Petition for rehearing denied.