[No. 4972–8–III. Division Three. June 14, 1983.]

PERRY THORNTON, *Respondent,* v. INTERSTATE SECURITIES COMPANY, ET AL, *Appellants.*

20

*Thomas A. Dietzen, Donald D. Bundy,* and *Weeks, Dietzen & Skala,* for appellants.

*Kevin S. Kirkevold* and *Dobbs, Moore & Kirkevold,* for respondent.

MUNSON, A.C.J.—"Interstate Securities Companies", with no further identification, appeal a trial court decision upholding an oral contract. Interstate Securities Companies (ISC) contend the trial court erred in (1) finding in personam jurisdiction over Interstate Securities Company,

Kansas (ISCK); (2) finding ISCK, a wholly owned subsidiary of ISC Financial Corporation (ISCFC), is a successor corporation to Interstate Securities Company, Delaware (ISCD), also a wholly owned subsidiary of ISCFC; (3) finding Mr. Thornton formed an oral contract with ISCD in addition to a written contract, and (4) rejecting ISCK's tender of the defense of impossibility. We affirm.

ISCD, involved in the consumer finance business, became interested in acquiring Surety Finance Company and its subsidiary, Cascade Industrial Loan Company (Surety), in Yakima, Washington. Mr. Ed Newcomer, executive vice-president and chief operating officer for ISCD, and Mr. Giambalvo, a field supervisor for "Interstate Securities Company",[1] went to Yakima in January 1974 to review the business and meet Mr. Perry Thornton. Mr. Thornton, Mr. Junker (a director of Surety), Ms. Soden (office manager for Surety), and Mr. Giambalvo all testified the primary asset which ISCD sought was Mr. Thornton. Because of his numerous contacts in the industry, his position as vice-president and then president of the Washington State Consumer Finance Association, his dealings since 1956 with Washington State's Division of Banking, Department of General Administration, his knowledge of state laws regulating small loan companies, and his experience in the field since 1946, Mr. Thornton was a valuable tool to assist ISCD's expansion into the northwest states. All of the above, except Mr. Giambalvo, testified they understood ISCD was not interested in the purchase unless Mr. Thornton agreed to work for ISC. This also was reflected in Surety's corporate minutes. Mr. Giambalvo testified it was "a foregone conclusion" to Mr. Newcomer that Mr. Thornton would remain in Yakima because Mr. Thornton was a very important part of ISCD's expansion efforts. Mr. Newcomer, on the other hand, testified the primary asset was the loan company; while it was consistent with his philoso-

---

[1]Mr. Giambalvo never made it clear whether he worked for ISCFC or ISCD, although it appears he worked for ISCD.

phy to retain key personnel, Mr. Thornton was only one aspect of the purchase. Mr. Thornton testified he did not wish to work for a large corporation and relented only upon the condition he be allowed to remain in Yakima. Mr. Junker, Ms. Soden, Mrs. Thornton and Mr. Giambalvo all indicated they understood this was of great importance to Mr. Thornton.

When agreement had been reached on Mr. Thornton's employment contract and the purchase of the company, Mr. Thornton and Mr. Junker traveled to Kansas City, Missouri, to meet with Mr. Newcomer and Mr. Giambalvo. Mr. Thornton rejected the employment contract because it did not include the agreed retirement benefits ($10,000 per annum from age 65 to age 69). A new contract was drawn; Mr. Thornton again rejected it because it had no provision for permanent residence in Yakima.

Testimony as to what happened next diverges. Mr. Thornton testified Mr. Newcomer stated he did not want to have the contract redone again, so they would agree verbally on the term; his word was good and, besides, there were two other witnesses. Mr. Junker testified Mr. Newcomer assured Mr. Thornton he would remain in Yakima "and his word was as good as this being in writing and there would be no reason for him to ever take him out of Yakima." Mr. Giambalvo testified Mr. Newcomer told Mr. Thornton, "you can trust me, we're not planning on moving you anywhere." Mr. Newcomer did not remember making such a promise and explained he would never orally promise not to relocate an individual. Mr. Thornton then signed the employment contract without the requested provision.

Three years later, Mr. Thornton received a letter from Paul Hamilton, Jr., president of Interstate Securities Company, stating ISCD and ISCFC had decided to sell substantially all of ISCD's assets to Beneficial Corporation. The letter was under a letterhead which stated:

INTERSTATE SECURITIES COMPANY
3430 Broadway, Kansas City, MO 64141
PHONE: (816) 753–5400
A subsidiary of ISC Financial Corporation.

When Beneficial Corporation did not hire him, Mr. Thornton contacted Mr. G. W. Richter, personnel director for ISCFC. Mr. Richter attempted to find Mr. Thornton a position in Old Security Life Insurance Company, a wholly owned subsidiary of ISCD. The job did not eventuate because Old Security went into receivership.

When ISCFC sold ISCD's assets to Beneficial Corporation, ISCK was formed by ISCFC to liquidate the receivables which Beneficial did not accept. ISCK's letterhead read:

Interstate Securities Company
P. O. Box 12410, Shawnee Mission, Kansas 66212
9590 Quivera Road, Shawnee Mission, Kansas 66215

Mr. Charles Waeckerle, one of those in charge of liquidating receivables, was transferred to ISCK in March of 1977. Prior to his assignment to ISCK, Mr. Waeckerle served a "dual role" as head of the securities department for ISCFC and as an operations supervisor for ISCD. Mr. Waeckerle stated that, except for the office staff, all personnel of ISCK were from ISCFC or ISCD. He was not sure who came from what company because employees of the three companies were all "interrelated" and "intertwined"—"We were all one big family." He knew his pay came from ISCFC and knew Mr. Thornton was paid out of "the home office" because Mr. Waeckerle signed all checks for ISCK. Mr. Waeckerle indicated he used Mr. Thornton to collect accounts in Washington state and reimbursed his collection expenses.

On April 4, 1978, Mr. Thornton received a letter from an attorney employed by Interstate Securities Company indicating he was to present himself at the "offices of Interstate Securities Company, 9590 Quivera Road, Lenexa [sic], Kansas", to be assigned new duties for the remainder of his contract. The letter then stated: "I am enclosing the check

of Interstate in the amount of $865.79, representing your salary for the period ending March 31, 1978." The check was drawn on a Kansas City, Missouri, bank, as were all other paychecks received by Mr. Thornton, and the yearly gross followed sequentially from the gross earnings of the previous pay period. The paycheck also did not indicate whether it was from ISCFC, ISCD or ISCK.

When Mr. Thornton refused to relocate to Kansas, he was terminated. This suit followed. After extensive analysis concerning whether jurisdiction had been proved, whether ISCK could be held liable as a successor corporation to ISCD, whether an oral contract was proved and whether the defense of impossibility applied, the court ruled in Mr. Thornton's favor. Interstate Securities Companies appeal.

Appellants first contend the trial court erred in finding jurisdiction over ISCK as a successor corporation to ISCD. The trial court did not believe ISCK had sufficient contacts with Washington to establish in personam jurisdiction, but found jurisdiction over ISCK as a successor corporation to ISCD. We hold ISCK had sufficient contacts to establish jurisdiction.

To subject a corporation to judgment in personam, there must be sufficient contact with the state so that it is fair and reasonable to require the corporation "to defend the particular suit which is brought there." *International Shoe Co. v. Washington,* 326 U.S. 310, 317, 90 L. Ed. 95, 66 S. Ct. 154, 161 A.L.R. 1057 (1945). The corporation's conduct and connection with the forum state must be such that it "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). While the limits on state jurisdiction have been relaxed in modern commercial transactions touching more than one state, each state must, out of respect for the sovereignty of its sister states, limit its authority to those controversies actually having an impact therein. *World–Wide Volkswagen Corp. v. Woodson, supra* at 293. The corporation must purposefully avail itself of the privilege of conducting an activity

here. *Hanson v. Denckla,* 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958).

In *Lewis v. Curry College,* 89 Wn.2d 565, 568, 573 P.2d 1312 (1978), the court stated:

(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

ISCK has independently developed minimum contacts with the state of Washington. It is true it has not carried on the business of its predecessor. It has availed itself, however, of the knowledge and services of Mr. Thornton to collect accounts receivable here. It has thus carried on activity which touched the matter in issue—use of Mr. Thornton's services under the employment contract with ISCD. The cause of action arises because ISCK refused to allow Mr. Thornton to remain in Washington. Traditional notions of fair play and substantial justice are not offended; Mr. Thornton was actively wooed and put into service by ISCFC affiliates in Washington until he was no longer needed. As stated in *Toulouse v. Swanson,* 73 Wn.2d 331, 334, 438 P.2d 578 (1968), "[i]t is beyond dispute that defendant consummated a transaction in this state when he employed plaintiff . . . ." *See also Cofinco, Ltd. v. Weiss,* 25 Wn. App. 195, 605 P.2d 794 (1980). The record contains sufficient contacts between ISCK and Washington to establish jurisdiction over ISCK independent of ISCD's contacts.

ISCK next argues the trial court erred in finding it liable for the remainder of Mr. Thornton's employment contract as a successor corporation to ISCD. Although ISCK admits it was an ISCK agent who ordered Mr. Thornton to relo-

cate and who terminated his contract when he refused, it argues this is not sufficient to establish liability of ISCK for ISCD's contract.

ISCK cites recent Washington cases which state the test of successor liability includes analysis of (1) whether the second corporation agreed to assume the debts of the first; (2) whether the new corporation was merely a consolidation or merger of the companies; (3) whether the transfer is one which is intended to defraud creditors; and (4) whether the second corporation is merely the reorganization of the first. *Culinary Workers Local 596 Trust v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 588 P.2d 1334 (1979); *Seipp v. Stetson Ross Mach. Co.,* 32 Wn. App. 224, 646 P.2d 783 (1982); *Cashar v. Redford,* 28 Wn. App. 394, 624 P.2d 194 (1981). Under the facts of this case, to give effect to ISCK's argument would place this court in "the untenable position of assisting in the accomplishment of a breach of duty owed respondent." *Culinary Workers Local 596 Trust v. Gateway Cafe, Inc., supra* at 367. The corporate form will be disregarded "to prevent unjustified loss to the injured party." *Meisel v. M & N Modern Hydraulic Press Co.,* 97 Wn.2d 403, 410, 645 P.2d 689 (1982) (quoting *Morgan v. Burks,* 93 Wn.2d 580, 587, 611 P.2d 751 (1980)); *Lindsay Credit Corp. v. Skarperud,* 33 Wn. App. 766, 657 P.2d 804 (1983).

In *J.I. Case Credit Corp. v. Stark,* 64 Wn.2d 470, 392 P.2d 215 (1964), the court reviewed the reasons for disregarding corporate form. It stated the thrust of analysis should not be whether "the elements of sameness" predominate, but whether there is "such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others." *J.I. Case Credit Corp. v. Stark, supra* at 475. The court refused to allow the credit subsidiary of J. I. Case Company to enforce a note and chattel mortgage when the parent company had not fulfilled its warranty obligations, stating at page 478:

> For the reason that Case owed a duty to Stark under its warranties, Credit cannot pose as a holder in due course and thus permit Case to escape its responsibilities. For the purpose of this suit, the corporate identities are one and the same. Although each of the items of identity may, in itself, be but a link in a chain to join the two corporations, *the final connection is established by the duty owed.* To hold otherwise would result in a wrong being perpetrated upon Stark.

(Italics ours.)

This analysis applies here. It is conceded the various ISC affiliates maintain a separate identity for many purposes. It is not conceded, however, that ISCFC, ISCD and ISCK have maintained corporate purity as relates to Mr. Thornton. The facts of this case clearly reflect the difficulty encountered by Mr. Thornton in his attempt to assess which corporation is liable for his contract and termination. Although no one is sure why ISCK was formed, it cannot avoid a contractual duty created by ISCD when it had the benefit of that contract. Fairness requires the corporate entity be disregarded. *Kueckelhan v. Federal Old Line Ins. Co.,* 69 Wn.2d 392, 411, 418 P.2d 443 (1966); *J.I. Case Credit Corp. v. Stark, supra; Superior Portland Cement, Inc. v. Pacific Coast Cement Co.,* 33 Wn.2d 169, 212, 205 P.2d 597 (1949); *Dummer v. Wheeler Osgood Sales Corp.,* 198 Wash. 381, 88 P.2d 453 (1939).

Interstate Securities Companies contend the trial court erred in finding an oral contract to locate Mr. Thornton in Yakima. Mr. Thornton contended at trial the oral agreement was that his Yakima *location* would be permanent. ISC contended at trial the word *position* as used in the agreement encompassed location. The relevant sections of the contract read:

> Employee shall work according to assignments made by the Company, which may be for other companies affiliated with the above–named Employer. The company for whom and the position at which the Employee works may be changed, from time to time, as such changes shall appear to the Employer to be for the best interests of the

Employee and said companies, provided such changes shall inure to and be binding upon Employee and any company as may be for the time being designated by present Employer as the future Employer of Employee. The term "Employer" shall include such other designated company or companies.

1. Employee shall work in the business of Employer and its affiliates, according to the assignments made by Employer.

2. The services to be rendered by Employee require special training, skill and experience, and this contract is made to obtain such skilled services for the Employer.

. . .

5. The services to be rendered by Employer [*sic*] shall begin on the commencement date and shall be such as the Employer shall designate from time to time, *together with all such work as is usual in connection with the position for which Employee is employed,* and Employee further agrees that Employer may use Employee's name in connection with the business as said Employer may desire.

(Italics ours.)

The trial court believed the contract granted ISCD virtually unlimited authority to assign an employee to various positions. However, when read with the italicized language in numbered paragraph 5, an ambiguity was created concerning for what work the employee had been employed. The trial court could find nothing in the written contract which explained for what Mr. Thornton had been employed. Both sides supplied their own explanation. ISC said it was for whatever position they chose wherever they chose. Mr. Thornton, supported by everybody involved in the transaction except Mr. Newcomer, testified he was hired specifically to expand operations in Washington and into surrounding states. Because the court believed the parties at the time of contracting intended the contract to be partly oral and partly written, the court affirmed the oral contract.

Although the court's analysis has become a focal point of ISC's argument, the court was not stating the contract was per se ambiguous. In fact, the court went to great lengths to

read "position" as "location", but concluded the phrase in paragraph 5—"in connection with the position for which Employee is employed,"—detracted from ISC's absolutist position. A fair reading of the phrase, in light of the entire contract, raises a question concerning whether the parties contracted intending to give ISC unlimited authority over Mr. Thornton's future. *See McGary v. Westlake Investors*, 99 Wn.2d 280, 285, 661 P.2d 971 (1983); *Grant Cy. Constructors v. E.V. Lane Corp.*, 77 Wn.2d 110, 459 P.2d 947 (1969). It is therefore clear the court's sole inquiry was whether the employment contract was a full integration of the parties' agreement. If it was, the court would refuse Mr. Thornton's theory of partial integration. *See Washington Fish & Oyster Co. v. G.P. Halferty & Co.*, 44 Wn.2d 646, 269 P.2d 806 (1954) (wherein the court stated parol evidence is admissible to ascertain the intent of the parties only when the written document is ambiguous or incomplete).

█ Perhaps the best statement of the partial integration exception to the parol evidence rule is found in *Buyken v. Ertner*, 33 Wn.2d 334, 205 P.2d 628 (1949) (quoting *McGregor v. First Farmers–Merchants Bank & Trust Co.*, 180 Wash. 440, 443, 40 P.2d 144 (1935)):

> The actual rule . . . is that all conversations and parol agreements between the parties prior to a written agreement are so merged therein that they cannot be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement.

*Buyken v. Ertner, supra* at 342. The court then stated at page 343:

> The doctrine of partial integration supplies an exception to the parol evidence rule in cases where one part of a transaction between parties has been committed to writing, but another part has been left in some other form.

This court's inquiry is, therefore, twofold:[2] (1) Is there lan-

---

[2]*Brust v. McDonald's Corp.*, 34 Wn. App. 199, 660 P.2d 320 (1983) states

guage in the contract which speaks to the issue whether Mr. Thornton will or will not remain in Yakima, Washington, for the term of the contract? We hold the court correctly found no such language. (2) Is the intent of the parties, gathered from the language of the contract and surrounding circumstances, consistent with this interpretation? We hold the evidence supports the trial court on this point. The record clearly indicates the parties intended "position" and "location" to have separate meanings at the time of contracting; we see no reason to engraft a new meaning to the word "location" now. The trial court correctly found an oral contract separate from and in addition to the written agreement.

Interstate Securities Companies next contend the court erred in refusing to accept the defense of impossibility. We do not agree. *Liner v. Armstrong Homes, Inc.,* 19 Wn. App. 921, 926, 579 P.2d 367 (1978) explains the defense in a commercial context:

> Impossibility of performance, which excuses a party's performance of a contract, is not the legal equivalent of subjective inability to perform. The doctrine does encompass both strict impossibility and impracticality due to extreme and unreasonable difficulty, expense, injury or loss. The mere fact that a contract's performance becomes more difficult or expensive than originally anticipated, does not justify setting it aside.
>
> It has long been recognized in Washington that when a party by his contract assumes an unqualified duty, he is bound to perform if possible, notwithstanding the occurrence of an unexpected, yet foreseeable event, against which he might have guarded in his contract.

there are two tests: a "mechanical" test and an "intent" test. Under the "mechanical" test, the court may not receive parol evidence if the instrument is unambiguous. Under the "intent" test, parol evidence may be received as an aid to interpretation even if the instrument is unambiguous. We are reluctant to adopt those characterizations. *Nashem v. Jacobson,* 6 Wn. App. 363, 366, 492 P.2d 1043 (1972). The court must always consider the evidence. *Becker v. Lagerquist Bros., Inc.,* 55 Wn.2d 425, 348 P.2d 423 (1960). When, however, it becomes apparent the parol evidence contradicts the written instrument, it cannot be given substantive effect. *Mapes v. Santa Cruz Fruit Packing Corp.,* 26 Wn.2d 145, 173 P.2d 182 (1946).

(Citations omitted.) Subjective inability to perform (*e.g.*, although it is possible this promise can be kept, I cannot) does not excuse performance. *Cannon v. Huhndorf,* 67 Wn.2d 778, 409 P.2d 865 (1966); Restatement of Contracts § 455 (1932). The "unexpected, yet foreseeable event" which renders performance impossible must be fortuitous and unavoidable on the part of the promisor. Annot., 84 A.L.R.2d 12, § 12, at 63 (1962); 17 Am. Jur. 2d *Contracts* § 406, at 855 (1964); 6 A. Corbin, *Contracts* § 1329, at 350 (1962).[3] Because performance was not rendered impossible by such an event, but rather ISCD's decision to sell its Washington assets, the defense is unavailable to it. *See* 18 S. Williston, *Contracts* § 1931, at 3 (3d ed. 1978); Restatement of Contracts §§ 454, 455, and 467 (1932).

Interstate Securities Companies contend the rule concerning performance is much broader now and urges we adopt the California definition: "'A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.'" *Schmeltzer v. Gregory,* 266 Cal. App. 2d 420, 424, 72 Cal. Rptr. 194, 198 (1968) (citing *Mineral Park Land Co. v. Howard,* 172 Cal. 289, 156 P. 458 (1916)). This test does not appear to differ significantly

---

[3]We perceive ISC is urging the defense of commercial frustration, rather than impossibility. Restatement of Contracts § 454, comment *b* (1932).

Performance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration.

The question in cases involving frustration is whether the equities of the case, considered in the light of sound public policy, require placing the risk of a disruption or complete destruction of the contract equilibrium on defendant or plaintiff under the circumstances of a given case . . .

(Citations omitted.) *Lloyd v. Murphy,* 25 Cal. 2d 48, 53–54, 153 P.2d 47, 50 (1944). The defense is limited to cases of extreme hardship where the event was not foreseeable and counterperformance is nearly or totally destroyed. Here, there is a lack of proof on whether Mr. Thornton's employment would constitute extreme hardship; although Interstate Securities Companies state the contract is "suicide", the facts do not support this position. The record also does not show that Mr. Thornton's counterperformance in the Northwest is valueless. All it shows is ISCK does not want Mr. Thornton here any longer. Balancing equities, the risk of disruption belongs with ISCK.

from *Liner v. Armstrong Homes, Inc., supra.* Under either test, objective impossibility (*e.g.,* no one can fulfill the promise) has been modified to objective impracticability (*e.g.,* the cost of performance by anyone is so great the promisor is excused). Although this test can include subjective impracticability (*e.g.,* the cost to me would be onerous), the focus is still on fortuitous intervening events. Moreover, ISC did not prove that the cost of maintaining Mr. Thornton's residence in Yakima would be onerous; rather, its entire argument is that it did not have work here for Mr. Thornton. As stated in *Brown v. Ehlinger,* 90 Wash. 585, 588, 156 P. 544 (1916):

> Courts cannot set aside contracts because the performance of them becomes more difficult or more expensive than when they were entered into. If it were so, few contracts would survive the seasons of depression that periodically recur in the business world.

The trial court is affirmed.

GREEN and McINTURFF, JJ., concur.

Reconsideration denied July 7, 1983.

Review denied by Supreme Court October 7, 1983.