[No. 36847. Department One. January 30, 1964.]

CITY NATIONAL BANK OF ANCHORAGE, *Appellant,* v. F. H. MOLITOR *et al., Respondents,* THE BANK OF CALIFORNIA, *Defendant.*\*

*Jerry T. Haggarty,* for appellant.

*Geraghty & Volinn,* for respondents.

HALE, J.—The point to this case involves changes effected in a written contract by parol evidence. Regrettably, we must take a long and tedious path to get to it.

Frank H. Molitor and Ralph E. Doremus carried on an accounting partnership in Anchorage, Alaska. Mr. Molitor became active in a corporation known as Anchorage Bus

*Reported in 388 P. (2d) 936.

Company, organized for the purpose of carrying passengers between military installations in the area and the city of Anchorage. In 1955, a rival bus company, Matanuska Valley Lines, challenged Anchorage Bus Company's certificate of convenience and necessity and enjoined its operations, bringing Anchorage Bus Company's activities to a standstill and cutting off all of its revenues.

Before the injunction, Mr. Molitor had borrowed substantial sums of money from City National Bank of Anchorage to put into the bus company and had personally guaranteed other loans made directly to the company. At the time of the injunction, Molitor had a total liability on these loans of $26,900 as maker and guarantor.

In October, 1955, in a transaction not related to the City National Bank loans in Anchorage, Molitor and his wife, Elizabeth, borrowed $45,000 from the Bank of California in Seattle, executing a series of demand notes signed by each of them. As security for this loan, they left in pledge with the Bank of California certain securities, all of which were the separate property of Elizabeth Molitor. One group of securities consisted of 108 shares of Gas Industries Fund, Inc.; 11 shares of Seattle-First National Bank; 70 shares of Portland Gas & Coke Company; 30 shares of Socony-Vacuum Oil Company; 30 shares of United Aircraft Corporation; and many shares of stock in other corporations of national reputation. As an additional part of the security given in pledge, Mrs. Molitor also turned over 114.1375 shares of James Griffiths & Sons, Inc., a Washington corporation. Both of the Molitors signed a pledge agreement which allowed the Bank of California to transfer or liquidate all or any part of these securities in case of a default by the Molitors. Mr. Molitor took the $45,000 derived from the loan and purchased a hangar and other buildings located on an airfield at Anchorage which he assumed could be used by his bus company if the injunction ended. The hangar earned $2,500 per month rental at the time, $1,500 per month of which Molitor assigned to the Bank of California to apply on the $45,000 loan.

City National Bank of Anchorage knew of this loan. It also knew of the injunction against Molitor's bus company and repeatedly asked Molitor to give it security for the loans it had made to him and to Anchorage Bus Company. Molitor, assuming that the United States Court of Appeals for the Ninth Circuit would reverse the trial court in the injunction proceeding, sought ways to keep himself and Anchorage Bus Company free from litigation until the decision came down from the Court of Appeals. Under pressure from City National Bank of Anchorage for security, the Molitors executed what the parties in the testimony refer to as the "three-party agreement."

In this three-party agreement, dated October 17, 1956, the Molitors, as husband and wife, and the Bank of California at Seattle, and the City National Bank of Anchorage, through a formal, four-page typewritten contract, declared that all of the Molitor securities and assignments then held in pledge by the Bank of California were likewise held in pledge as security for the loans from and guarantees to the City National Bank of Anchorage. In express language, it stated that, whenever all of the Molitors' debts to the Bank of California had been paid and satisfied in full, that bank would be authorized to deliver all of the securities and assets held by it in pledge or assignment as security for the Molitors' loans over to the City National Bank of Anchorage. Thereafter, City National Bank would hold such securities and assigned property as security for the obligations of F. H. Molitor and for any loans made to or guaranteed by him. The written instrument provided that City National Bank would succeed to all of the rights of the Bank of California upon paying off Molitors' debts to the latter.

More than a year after the signing of the three-party agreement, on January 22, 1958, pursuant to its terms, City National Bank paid off all of the Molitors' obligations to the Bank of California in the sum of $27,660.38, the amount claimed, and took assignment and delivery from that bank of all the securities the Molitors had pledged to the Bank of California to secure their loans. A week later, on January 29, 1958, City National Bank gave written notice to the

Molitors that it had discharged the latters' obligations to the Bank of California under the three-party agreement of October 17, 1956, and had received all of the securities by assignment. The notice demanded payment within 10 days of both the assigned debts and City National Bank's original debts. Included in the notes transferred by the assignment from the Bank of California was one made by Molitor and Doremus, dated November 9, 1957, in the amount of $3,500, of which $500 had been paid, due on demand February 7, 1958. In a separate letter dated January 30, 1958, City National Bank demanded payment of this note on the due date. Further notice was given later.

In formal instruments dated February 20, 1958, City National Bank served upon F. H. and Elizabeth Molitor demand for payment in full of all notes assigned from the Bank of California, the balance due being stated at $28,-004.72, and, additionally, for full payment of judgments in the amount of $38,100.80 it had obtained on the notes made by, or guaranteed by, F. H. Molitor on behalf of Anchorage Bus Company to City National Bank. This notice to the Molitors declared that, if the total sums demanded were not paid by March 10, 1958, the securities delivered in pledge to the Bank of California, and thereafter in further pledge to the City National Bank pursuant to the three-party agreement, would be sold at public auction. The securities were particularly described by certificate numbers and the names of the companies identified and the date of the sale was fixed in the notice as March 10, 1958, to be held at the offices of the bank's attorneys in Anchorage.

A similar notice followed, concerning the proposed sale of the 114.1375 shares in James Griffiths & Sons at public auction April 15, 1958. And, pursuant to the terms of these notices, all of the securities which had been delivered in pledge by F. H. and Elizabeth Molitor to the Bank of California, and thence transferred to the City National Bank of Anchorage, were sold at public sale and the revenue derived therefrom credited to the Molitors' indebtedness. In accordance with City National Bank's computations, the

amount realized from the sale of the pledged securities was insufficient to liquidate the Molitor and Doremus note of 1957, upon which was still owing the sum of $3,000. Accordingly, the bank initiated this case in a simple suit on that note to recover the sum due thereon together with attorney's fee and interest.

To the complaint on this note, the Molitors cross-claimed that the three-party agreement under which the pledged securities had been transferred to the City National Bank was subject to an oral agreement changing it. As cross-complainants, the Molitors asserted that the president of the bank—he was deceased at time of trial—in a number of conversations before the execution of the three-party agreement, had promised Molitor that the bank would forbear any legal actions on the notes made or guaranteed by Molitor until the United States Court of Appeals for the Ninth Circuit had announced its decision in the Matanuska Valley Lines injunction suit. They urge that, when the bank, on November 30, 1956, had brought action against Molitor on several notes for a total of $26,900, this constituted such a breach of the entire contract as to vitiate the three-party agreement. They say that breach of the claimed oral agreement not to sue terminated whatever rights the bank had acquired in the pledged securities under the three-party agreement, and therefore, that the subsequent sale of the pledged securities constituted a tortious conversion. The learned trial judge accepted this view.

Curiously enough, Molitor had shown little concern at the instigation of the actions on the notes and guarantees on November 30, 1956, by the bank in Anchorage, for he allowed a default to be entered against him more than 9 months later, on September 24, 1957.

The bank appropriately objected to proof of the claimed oral agreement not to sue, urging upon the trial court its position that the asserted conversations between Molitor and the president of the bank were an attempt to prove a condition subsequent and that the terms of the written instrument could not be varied by parol evidence of a

condition subsequent. The court overruled the objection on this point and adopted Molitors' theory when it made the following finding:

". . . that the consideration for the defendants Molitor executing this agreement was the promise of the plaintiff that it would not institute or commence legal proceedings against F. H. Molitor or Anchorage Bus Company prior to the determination of said appeal to the Ninth Circuit Court of Appeals, it having been the understanding of all the parties to the agreement that said determination would be forthcoming in April or May 1957."

Having sustained the Molitors' position, the court held the sale of the securities to be a conversion and formally concluded:

"That the institution by the plaintiff of legal proceedings against F. H. Molitor and Anchorage Bus Company in Anchorage, Alaska, on or about November 30, 1956, constituted a material breach and a substantial withdrawal of the consideration for the defendants Molitor becoming parties to the agreement of October 17, 1956, and that from and after the date of November 30, 1956, plaintiff had no rights whatsoever under said agreement."

The trial court granted Elizabeth Molitor judgment of $16,605.22, as representing the difference between value of the stock at its highest point before trial, plus dividends earned, and the amount for which it was sold to apply on the debts. And, as to the 114.1375 shares of the James Griffiths & Sons stock which the bank had transferred to City Commerce Company, a holding company, of which it is a subsidiary, for the sum of $25,000, the court accepted its quoted book value of $53,302, as of October 17, 1956. It directed in its judgment that this stock be either returned to Elizabeth Molitor, or, in the alternative, that she have judgment for the said book value of $53,302.

Thus, from a simple suit on a promissory note for $3,000, the bank came out of the case with a judgment against it totaling a possible $70,000. It appeals.

Despite the complicated nature of the financial transactions and the profusion of documents, contracts and correspondence passing among the parties, this appeal seems

to turn on but one point: Did proof of conversations involving promises not to sue constitute proof of a condition subsequent? Molitor sought to prove that the three-party agreement between the Bank of California, the City National Bank and the Molitors did not express the entire contract among the parties.

Here is a representative part of F. H. Molitor's testimony:

"Q. Mr. Molitor, did you have discussions with Mr. Crawford, president of City National, about what you would require from him before signing an agreement giving him the collateral which you had already given to the Bank of California, you and your wife? A. Yes, I did. Q. What did you tell him? A. I told him that it was necessary that he agree to, or he or he for his bank agree that there would be no litigation in connection with the suit or collection of the amount of notes that I had signed to the City National or guaranteed to the City National, plus the fact I also told him I wanted to concentrate on the liquidation of the Bank of California's obligation first off. I didn't want to have two major creditors. I wanted one at that time."

He said, also, that he had told the bank president that the three-party agreement depended on the bank's promise not to sue on its notes and that he and his wife signed the three-party agreement with the understanding that the agreement not to sue was a condition of the agreement.

To this evidence, appellant made sufficient objections that the conversation concerning a promise to forbear suit constituted proof of a condition subsequent, and that proof of a condition subsequent to vary the terms of a written agreement by parol evidence does not lie.

From a judgment based on a ruling that the bank, by bringing suit against Molitor individually and the Anchorage Bus Company, had breached the three-party agreement to a substantial degree, plaintiff bank had thereby lost all rights under the agreement from and after November 30, 1956, the bank appeals. This brings us to the point of law upon which the case turns.

If the parol evidence upon which the court found that appellant bank had abrogated the formal three-party agreement, by violating its claimed promise not to sue

until the decision from the Ninth Circuit Court of Appeals had been announced, is admissible, then the judgment must be affirmed. If the parol evidence is inadmissible as attempting to vary the terms of a written instrument by parol evidence, the cause must be reversed and judgment entered on the note sued on.

First, we should make it clear that the three-party agreement of October 17, 1956, between the Bank of California, City National Bank of Anchorage and Mr. and Mrs. Molitor, is clear, unambiguous and complete to express the intent of the parties in carrying out the purposes contemplated— (1) to extend the pledge of all securities held by the Bank of California to the appellant bank for all sums due or to become due in the future; and (2) to allow City National Bank to enforce the pledge against both the Molitors and the Bank of California by first discharging all of the Molitors' debts to the Bank of California. That this formal contract is amply supported by a consideration and needs no formal words of art to identify the consideration is clear, and the contract is, therefore, enforcible in accordance with its terms. To express it another way, the instrument describes the consideration moving to and from the parties signatory thereto, and proof of consideration outside the instrument is not essential to sustain it as a contract. In the matter of consideration, the contract is entirely self-contained.

██ If the bank orally agreed to maintain no action against Molitor before the decision came down from the Circuit Court of Appeals, does this constitute a condition subsequent?

" . . . A fact is a condition precedent to the legal relation for the creation of which it is necessary. *A fact is a condition subsequent to the legal relation that it extinguishes.* . . . " (Italics ours.) 3A Corbin, Contracts § 739.

Williston says it a little differently:

" . . . The term 'condition subsequent' as normally used in contracts in contrast to 'condition precedent' should mean subsequent to a duty of immediate performance, that

is, a condition which divests a duty of immediate performance of a contract after it has once accrued. Such conditions are very rare. . . ." 5 Williston on Contracts (3d ed.) § 667.

Here, the legal relationship had been created among the parties by (1) loans to the Molitors from both banks; (2) execution of the pledge agreements by the Molitors to the Bank of California; and (3) execution of the three-party agreement among the two banks and the Molitors on October 17, 1956. It follows, then, that the oral statements attributed by Molitor to the president of appellant bank created a condition, if accepted, extinguishing a legal relationship already established. Hence, the testimony described what the courts and authorities identify as a condition subsequent: A promise which extinguishes the contract among the parties.

■ Having concluded that the promise created a condition subsequent, there remains but one further question. Was parol evidence admissible to prove the condition subsequent that would abrogate the formal written agreement?

Professor Williston would not allow it:

"Whether a written contract is sealed or unsealed, it cannot be shown that under a parol contemporaneous agreement a written contract, once effective, was to be terminated by a *condition subsequent* or at a time not stated in the writing: 'When a written contract has been unconditionally delivered in the sense that it is intended to take effect as a legal obligation, a contemperaneous oral agreement, providing that the contract is not to be performed if a certain condition or contingency occurs, cannot be shown, as such testimony would have the effect of adding to, varying or contradicting the express terms contained in the writing.'

" 'It is well settled that such type of condition [subsequent] may not be shown by parol evidence to contradict the terms of a written contract.' " (Italics ours.) 4 Williston on Contracts (3d ed.) § 634.

We have consistently held to the view that, although parol evidence of prior or contemporaneous agreement may be admissible to show conditional delivery of a written agreement and that the instrument is not to take effect

until the occurrence of a certain event or the coming into existence of a particular fact, such evidence is not admissible to show either (1) that the intentions of the parties were different from those expressed in their written instrument or (2) that the agreement may be extinguished upon the occurrence of a certain event or coming into existence of a given fact. *McDonald v. Wyant,* 167 Wash. 49, 8 P. (2d) 428; *First State Bank of Kellogg v. Merritt,* 163 Wash. 467, 1 P. (2d) 902.

We said this explicitly in *Ravenholt v. Hallowell,* 48 Wn. (2d) 136, 291 P. (2d) 653, where, in an action brought by the vendor of real estate, the vendor sought damages for the buyer's failure to go through with the deal in accordance with the terms of a written agreement. The purchaser defended on the premise that, at the time she signed the agreement to buy the house, she had an oral agreement that it would be void if she were unable to raise sufficient funds for the purchase from the sale of her own property. We held evidence of the conditions sought to be impressed on the contract by parol evidence inadmissible when we said:

" . . . The most favorable inference to be derived from her testimony is that the parties agreed on a condition subsequent; namely, that in the event the respondent should be unable to raise the necessary funds through the sale of her property, the contract should become null and void.

"While parol evidence is admissible to show a separate agreement that a written instrument shall not become binding until a future day or until the happening of a future event (*Nelson Equipment Co. v. Goodman,* 42 Wn. (2d) 284, 254 P. (2d) 727 (1953); *Mapes v. Santa Cruz Fruit Packing Corp.,* 26 Wn. (2d) 145, 173 P. (2d) 182 (1946)), such evidence may not be admitted for the purpose of proving a condition subsequent which would cut off the plaintiff's right to recover on the unconditional promise of the defendant contained in a written contract. *McDonald v. Wyant,* 167 Wash. 49, 8 P. (2d) 428 (1932). . . ." *Ravenholt v. Hallowell, supra.*

Our statement, "If a contemporaneous oral agreement, depending on the happening of a condition subsequent, could defeat recovery on a note, the rule which provides

that a written instrument cannot be varied by parol evidence, would be abolished." made in *Whitman Realty & Inv. Co. v. Day*, 161 Wash. 72, 296 Pac. 171, was confirmed by us in *Mapes v. Santa Cruz Fruit Packing Corp.*, 26 Wn. (2d) 145, 173 P. (2d) 182.

In *Fleetham v. Schneekloth*, 52 Wn. (2d) 176, 324 P. (2d) 429, we said:

" . . . This court has adhered to the rule that, where there is no ambiguity, all conversations, contemporaneous negotiations, and parol agreements between the parties prior to a written agreement are merged therein. In the absence of accident, fraud, or mistake, parol evidence is not admissible for the purpose of contradicting, subtracting from, adding to, or varying the terms of such written instruments. [citing cases]"

▮ The courts have long known of the danger in permitting a carefully prepared agreement in writing to be vitiated by evidence of conversations so that the writing becomes inoperative on the occurrence of subsequent facts or events. Under such a rule, consider the futility of a thoughtfully negotiated, carefully prepared, deliberately executed, clearly expressed, written agreement, which, after intentional delivery to the contracting parties, may be jeopardized by proof arising from casual conversations and random comments of the parties privy thereto. Assurance that written contracts, unambiguous in expression, free from fraud or coercion, will be respected by the courts, helps hold together in a goodly degree the economic fabric of the nation. That this is so we learn from judicial declarations that the parol-evidence rule is no mere rule of evidence but one of substantive law. It is a rule so pervasive and deeply rooted that, even though the parol evidence which falls within the interdiction of the rule be admitted without objection, it will be disregarded; for it is not competent evidence and cannot be considered as having probative value. *Fleetham v. Schneekloth, supra*; *St. Paul & Tacoma Lbr. Co. v. Fox*, 26 Wn. (2d) 109, 173 P. (2d) 194.

Hence, the evidence presented by respondent F. H. Molitor concerning his conversations with the president of

appellant bank, that the bank would institute no proceedings in the courts prior to announcement of the decision in the injunction case against Anchorage Bus Company, constituted proof of a condition subsequent by parol. It was inadmissible; the objection to it should have been sustained.

This leaves the three-party agreement of October 17, 1956, intact and the rights of respondent under it to sell the pledged securities untrammeled.

Therefore, the judgment of the trial court is reversed with directions to grant judgment to appellant on the note sued upon and to dismiss respondents Molitors' cross claim.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.

March 13, 1964. Petition for rehearing denied.