[No. 39462.     Department Two.     October 16, 1969.]

GRANT COUNTY CONSTRUCTORS *et al., Appellants,* v. E. V. LANE CORPORATION *et al., Respondents.*\*

\*Reported in 459 P.2d 947.

John Gavin and Gavin, Robinson, Kendrick, Redman & Mays (Hall, Henry, Oliver & McReavy and Lee H. Cliff, of counsel), for appellants.

Alan A. McDonald (of Halverson, Applegate & Mc-Donald), for respondents.

HALE, J.—Grant County Constructors, prime contractor on the Columbia River Wanapum hydroelectric project, seeks recovery against its subcontractor and the latter's insurance carriers for fire damage to a generator shaft. The trial court, ultimately seeing an ambiguity in the contract between the two contractors and in the insurance policy, admitted parol evidence to explain the ambiguity. From this parol evidence, the court concluded that the prime contractor and not defendant subcontractor was on the risk at the moment of loss, and defendant insurance carriers, therefore, were not liable. The prime contractor and its insurance carrier appeal.

Grant County Constructors, a joint venture composed of four construction companies, was awarded the prime contract in 1959 by Grant County Public Utility District No. 2 to build the Wanapum Dam and powerhouse on the Columbia River and to install the hydroelectric generating system at a contract cost of about $92,000,000. The joint venturing companies delegated to Morrison-Knudsen Company, one of the members, main powers of management, supervision and leadership in performing the contract. Equipment and materials essential to build the dam and complete the hydroelectric generating system would exceed $30,000,000. Contrary to the customary practice in hydroelectric developments, the contract required Grant County Constructors to purchase and supply all equipment and materials required for the project. To meet this added responsibility, Grant County Constructors procured comprehensive insurance coverage—including a transportation floater—from plaintiff Fireman's Fund Insurance Company effective in

July, 1959, covering losses incurred during transportation of materials and equipment.

September 30, 1959, Grant County Constructors awarded to Gunther-Shirley-Lane Corporation a $3,000,000 subcontract to perform the mechanical work on the dam and powerhouse, including installation of the generators. Gunther-Shirley-Lane, a joint venture of E. V. Lane Corporation and Gunther & Shirley Company, designated E. V. Lane Corporation as the lead, sponsoring and managing member. At the outset, the subcontractor was not required to provide fire insurance coverage for the material and equipment to be supplied by Grant County Constructors for installation under the mechanical subcontract.

After awarding the mechanical subcontract, however, plaintiff Grant County Constructors, facing possibilities of a high insurance loss on the $92,000,000 prime contract, decided to share this insurance risk by having Gunther-Shirley-Lane provide insurance protection on materials, supplies and equipment utilized in performing the subcontract. Even if it were to pay the premium for this insurance, the prime contractor saw a benefit in transferring a part of the risk. The enormity of the losses possible under the entire contract persuaded the prime contractor that a sharing of the risk would be one means of avoiding an exceptionally unfavorable loss experience. Promising to pay the premiums, Grant County Constructors sought to induce Gunther-Shirley-Lane to procure fire insurance protection on all materials, equipment and supplies utilized in the course of performing the mechanical subcontract.

Accordingly, Grant County Constructors opened negotiations by requesting Gunther-Shirley-Lane to study the matter of insurance protection with the idea of obtaining adequate fire insurance coverage. After a period of negotiations and after Grant County Constructors had considered certain proposals advanced by Gunther-Shirley-Lane, their representatives met in Boise, Idaho, November 3, 1959, to discuss insurance matters. Following these negotiations, the parties on January 14, 1960, entered into a written agreement referred to as modification No. 1, as follows:

GRANT COUNTY CONSTRUCTORS
MODIFICATION No. 1
to Subcontract of
Gunther-Shirley-Lane
\* \* \*
Wanapum Development—Columbia River
For Grant County Public Utility District No. 2

Contractor and Subcontractor understand and agree that *Subcontractor will assume responsibility* for the protection of work, equipment and materials covered under its Subcontract dated September 30, 1959, *from the time such property, equipment and materials are handled by or placed in the custody of Subcontractor and during such time as Subcontractor is performing any operation thereon until Subcontractor is relieved from physical custody thereof or until the installation of said property, equipment and materials has been completed and accepted by the District.*
*Subcontractor agrees to secure and maintain suitable insurance covering this responsibility* with a limit of $2,000,000 per occurrence. Upon receipt by Contractor of a copy of such policy or policies evidencing this coverage, Contractor agrees to pay to Subcontractor the sum of $24,000.00.
IN WITNESS WHEREOF, the parties have set their hands this 14th day of January, 1960.

GRANT COUNTY CONSTRUCTORS

Witness:
/s/ W. H. Smith

By: /s/ George Piedmont

Witness:
/s/ W. W. Davis

GUNTHER-SHIRLEY-LANE
By: /s/ E. V. Lane

(Italics ours.)

Modification agreement No. 1 was a carefully negotiated contract. Although it was dated January 14, 1960, the parties had apparently substantially agreed upon its terms earlier, for on November 6, 1959, the general counsel for Grant County Constructors, referring specifically to this agreement, wrote a letter[1] to Gunther-Shirley-Lane which contained the following paragraph:

[1] The letter of November 6, 1959, is set out in full in appendix A.

It is understood and agreed that you have undertaken full responsibility for the protection of all work, property, equipment and materials entrusted to your custody from the time you take physical custody thereof until the time you are divested of physical custody or until such work, property, equipment and materials are completed and have been accepted by the Public Utility District. Likewise, we understand that you are obtaining insurance with a primary limit of $2,000,000 covering this responsibility.

Acting in accordance with this letter and the modification agreement, Gunther-Shirley-Lane proceeded to obtain insurance from defendant insurance companies with defendant American Home Assurance Company assuming 50 per cent of the risk and defendants Universal Insurance Company, Balfour Guthrie Insurance Company, Agricultural Insurance Company and United States Fire Insurance Company the remaining 50 per cent at $12\frac{1}{2}$ per cent each. The policy, issued for a premium of $24,000, expressly named "Gunther-Shirley-Lane Wanapum Powerhouse Joint Venture (Subcontractors)" as the insured, and covered "all materials and equipment and structures and appurtenant work to be used in connection therewith." It fixed the beginning and duration of the risk as follows:

Insurance hereunder attaches from the moment property insured becomes at risk of the contractor and/or their subcontractors including during process of unloading, until installation has been completed and accepted by the owner and the liability of the assured therefor shall cease, except as hereinafter limited or excluded.

The policy contained a provision expressly waiving rights of subrogation and contribution from Grant County Constructors as prime contractor and its insurance carrier.[2] Sometime in January, 1960, Grant County Constructors, in accordance with modification agreement No. 1, paid the entire $24,000 premium on the policy.

The subcontract on the mechanical work called for

---

[2]Salient paragraphs of the policy are set forth in appendix B.

Gunther-Shirley-Lane to install the turbines and generators in the powerhouse. Finely machined and delicately balanced, each shaft for the generators weighed about 100 tons and had been ordered by Grant County Constructors from the General Electric Company. They were to be shipped from Schenectady, New York, to the Grant County Constructors at the Wanapum Dam site and then installed by Gunther-Shirley-Lane, subcontractor. Unloading and handling of these heavy shafts came under provisions of the subcontract which said:

> Contractor to provide whirley crane service in powerhouse area, and crane service for lifts in excess of 35 tons.
>
> "Provide" as used herein means "Provide without charge."
>
> . . .
>
> . . . Subcontractor will accept all items other than District furnished items at the railroad spur provided and *will unload, transport, store and reload all such items.*

(Italics ours.) Thus, in their basic construction contract for the mechanical work, Gunther-Shirley-Lane undertook to unload, transport, store and reload the generator shafts, and Grant County Constructors agreed to facilitate these operations by providing whirley cranes for loads exceeding 35 tons.

Grant County Constructors ordered 10 generator shafts from the General Electric Company. Before shipment, each shaft was wrapped in sisal paper, crated in wood and then loaded on a flatcar at Schenectady, New York. The first shaft arrived on a flatcar in the spring of 1961, many months after the execution of modification agreement No. 1 and after defendant insurance companies had issued to Gunther-Shirley-Lane the insurance policy now in controversy and for which Grant County Constructors had paid the premium.

Although plaintiff had agreed to provide whirley crane service for lifts over 35 tons, its cranes were in use elsewhere at the project and thus not readily available. As a

substitute for the whirley crane service, Grant County Constructors' rigger superintendent and its project manager with the concurrence of Gunther-Shirley-Lane devised a means of pulling and skidding the shafts from the flatcars on which they had been shipped onto a timbered cribbing erected by the prime contractor upon an earth-filled ramp alongside the railroad spur. The subcontractor agreed to this method, but its superintendent, in the course of the discussions which preceded adoption of the idea, orally on behalf of his company, disclaimed any liability for damages which might be incurred by it.

Four generator shafts arrived at the Wanapum Dam site railroad spur and were unloaded by means of the skidding system without incident. Shortly after arrival of the shaft at the railroad spur, representatives of Grant County Constructors and Gunther-Shirley-Lane would board each flatcar which carried a generator shaft. The prime contractor would inspect the shaft to look for whatever damage he could find in making what is called a "concealed damage report" to the railroad, and defendant subcontractor's office manager would board the car for the purpose of issuing a receiving report. No problems arose and nothing untoward occurred when the first four shafts were inspected, reported on and unloaded by this method.

Then, on October 5, 1961, the fifth generator shaft arrived on a flatcar in the receiving yard spur line at the dam site. Three men, the foreman of Grant County Constructors, the office manager of Gunther-Shirley-Lane and one of the latter's carpenters, boarded the flatcar there. Gunther-Shirley-Lane's carpenter removed a part of the crating and paper to enable the two others to inspect the shaft and after they had done so he then replaced and restored the crate. Grant County Constructors' foreman prepared the concealed damage report for forwarding to the railroad company and Gunther-Shirley-Lane's office manager initialed it. The Gunther-Shirley-Lane office manager then made out a receiving report that day (October 5, 1961), and sometime later sent a copy of it to Grant County Construc-

tors. This report, according to the evidence, was received by the prime contractor on October 18, 1961.

October 6, 1961—nearly 24 hours after representatives of the prime contractor and subcontractor had gone aboard the flatcar, inspected the shaft, and made out the routine concealed damage report and the receiving report—the fire occurred. A rigger in the employ of plaintiff Grant County Constructors, to enable the crate to be moved onto the adjacent cribbing, went aboard the flatcar to remove the metal tie-downs which secured the shaft's crate to the car. While he was cutting a tie-down with his acetylene torch, sparks from the torch ignited the sisal paper and set fire to the crate, seriously damaging the shaft. So great was the damage that the shaft had to be replaced at a cost of approximately $208,000.[3]

Although the fire and consequent damage occurred when an employee of Grant County Constructors was engaged in cutting the retaining bands with a blowtorch, questions of negligence, proximate cause, and responsibility for the efficient and producing cause of the damage do not govern a resolution of the issues before us. Our concern is not to fix responsibility for failure to exercise due care under the circumstances but rather to ascertain which party bore the risk of loss at the time it occurred. In other words, this is not a case in tort, but one in contract. The ultimate question is, Who was on the risk—plaintiff general contractor or defendant subcontractor—when the fire happened?

Resolution of the ultimate question turns on whether an ambiguity existed in Gunther-Shirley-Lane's policy of insurance or the modification agreement which would warrant admission of parol evidence. If there was such an ambiguity that the court could not reasonably ascertain the

---

[3]"That on the following day, October 6, 1961, a rigger in the employ of Grant County Constructors was engaged in removing the metal tiedowns which held the shaft in its crate to the flat car, preparatory to having the crate moved off the flat car onto the adjacent cribbing and, while so engaged, sparks from the torch he was using caught the sisal paper aflame, causing the crate to burn, and so damaged the shaft by fire that it had to be replaced at a reasonable cost of approximately $208,200.00." Finding of fact No. 10.

parties' intentions from the language employed, then parol evidence to explain the ambiguity was admissible. If, however, there was no such ambiguity as in law would warrant the admission of extrinsic evidence to enable the court to determine what the parties intended in their agreement, then the defendant subcontractor as a matter of law under the agreement should be deemed on the risk at the time of the loss.

At the outset, the learned trial judge found no ambiguity, ruled that the modification agreement and defendant subcontractor's insurance policy were unambiguous, and held that parol and extrinsic evidence to explain them should be excluded. But against a possibility that the court might ultimately come to the conclusion that the agreements were ambiguous and to provide a complete record on review, it permitted the defendants to make a comprehensive offer of parol and extrinsic evidence by questions and answers.[4]

In defendants' offer of proof, the court heard extensive testimony running to thousands of words concerning the parties' negotiations, conversations, correspondence and conduct surrounding the writing of the letter, the execution of the modification agreement and the purchasing of insurance. It heard oral evidence that, during a time after the modification agreement had been signed and defendant subcontractor had procured the insurance, its representative disclaimed responsibility for damages which might be incurred by skidding or sliding the shafts onto cribbing during unloading. This oral disclaimer, however, we think,

---

[4]"I am going to permit the defendant to make an offer of proof by question and answer method directed to this matter of ambiguity. At the moment I don't feel that it should be considered by the court, because I consider this unambiguous, but if some reviewing court feels that it is ambiguous, they may want to make use of such testimony, and I feel that it should be permitted in for that reason.

". . .

"This evidence so admitted will be admitted only conditionally. It will be considered by way of an offer of proof and not as proof itself, unless the court later should reverse its present opinion that this is unambiguous."

would not operate to alter the terms of a written policy of insurance or the contract between the parties unless, of course, it was admitted to explain or resolve an ambiguity.

On completion of the evidence, the court concluded that an ambiguity existed in the written modification agreement and insurance policy, and that the parol and extrinsic evidence received as an offer of proof was relevant and material evidence from which to resolve the ambiguity. The court then held that, at the time of the fire, the generator shaft was not in the custody of the defendant subcontractor, that defendant was not on the risk, and that its insurance carriers, accordingly, were not liable on their policy for the damage to the shaft.

Determining that the word *custody* as used in the modification agreement meant physical custody, the court held that, since it was an employee of plaintiff Grant County Constructors who cut the tie-downs with a torch, plaintiff prime contractor and not defendant subcontractor had physical custody of the shaft when the loss occurred. In the court's view, the language *physical custody* in the written modification warranted the admissibility of extrinsic evidence to explain what the parties meant by it and concluded that they did intend a physical dominion. In addition, because Gunther-Shirley-Lane's policy of insurance protected it "from the moment property insured becomes at risk of the contractor and/or their subcontractors," the court considered this also an ambiguity requiring parol evidence to explain that plaintiff was elsewhere referred to as "contractor" and defendant joint venturers as "subcontractors."

The record does not otherwise make clear what the ambiguities were which the court admitted parol evidence to explain, and we find no reference to them in the findings. Ambiguity, however, is referred to in conclusion No. 8 where the court formally concluded that:

[I]f there be no ambiguity in said insurance policy or if parol evidence is not admissible when offered to establish noncoverage of a policy, then the property in question at the time of its loss would be at the risk of the defendant insurance companies and not at the risk of the plaintiffs;

but the court concludes that there is an ambiguity in the insurance policy of defendants, in that the commencement of its risk occurs, according to the terms of the policy, "from the moment property insured becomes at risk of the contractor and/or their subcontractors," . . .

Our views concerning possible ambiguities in the policy and modification agreement differ from those of the trial court. Comparatively few words in the English language have but one meaning and thousands of them many. Consequently, the subject of ambiguity in written contracts must be approached most cautiously else we develop a rule in which nearly every writing, no matter how carefully negotiated and thoughtfully prepared, must be held ambiguous. If every word or phrase which is susceptible of more than one meaning necessarily creates an ambiguity, then a written contract—or statute, for that matter—could rarely be held to be of binding force. We must take care that the process of reducing an agreement to writing is not an unavoidable exercise in futility. Why should the parties put an agreement in writing when they know that the courts will inevitably admit thousands of words of parol evidence to explain what it means and what the parties intended by it?

■ Vast areas of commerce, industry, finance, labor-management relationships and agriculture depend to a great degree on the integrity of written contracts. Because they occupy so signal a place in the law, a number of rules of construction have evolved to aid in their interpretation. Thus, the courts are in nearly universal agreement in construing written contracts that the primary purpose of a judicial interpretation is to ascertain the parties' intentions, give effect to them and make the parties' intentions controlling. *Silen v. Silen,* 44 Wn.2d 884, 271 P.2d 674 (1954); *Boeing Airplane Co. v. Firemen's Fund Indem. Co.,* 44 Wn.2d 488, 268 P.2d 654, 45 A.L.R.2d 984 (1954). The intentions of the parties should be ascertained from the entire writings, and, if at all possible, all parts of the writings shall be construed so as to harmonize with one an-

other. 17 Am. Jur. 2d *Contracts* § 258 (1964); *Gray v. Gregory,* 36 Wn.2d 416, 218 P.2d 307 (1950).

■ The most reliable clue to the parties' intentions in a deliberately prepared and negotiated contract is the language of the contract. *Hastings v. Continental Food Sales, Inc.,* 60 Wn.2d 820, 376 P.2d 436 (1962); *Boeing Airplane Co. v. Firemen's Fund Indem. Co., supra; Gwinn v. Cleaver,* 56 Wn.2d 612, 354 P.2d 913 (1960). When the intention of the parties is clear from the written instruments, the courts have nothing to construe and must be governed by the language. *Silen v. Silen, supra.* Words will be given the meaning which best gives effect to the parties' apparent intentions. *Patterson v. Bixby,* 58 Wn.2d 454, 364 P.2d 10 (1961).

■ Thus, it follows that the courts cannot and ought not make contracts for the parties and, assuredly, cannot make a contract for them which they did not make for themselves. *Jackson v. Domschot,* 40 Wn.2d 30, 239 P.2d 1058 (1952); *Merlin v. Rodine,* 32 Wn.2d 757, 203 P.2d 683 (1949). Courts should take care under the guise of interpretation not to rewrite the contract for the parties, or create a new one. *Clements v. Olsen,* 46 Wn.2d 445, 282 P.2d 266 (1955).

■ Therefore, unless there is an ambiguity, parol evidence or proof of extrinsic circumstances to explain the meaning in arriving at the parties' intentions is inadmissible. Courts should not find an ambiguity in order to construe the contract, and an ambiguity will not be read into a contract where it can reasonably be avoided by reading the contract as a whole. *Hering v. St. Paul-Mercury Indem. Co.,* 50 Wn.2d 321, 311 P.2d 673 (1957); *Hastings v. Continental Food Sales, Inc., supra.* Accordingly, even though some of the words used in the contract may be said to be ambiguous, if the terms of the contract taken as a whole are plain and unambiguous, the meaning should be deduced from the language alone without resort to extrinsic evidence. *Boeing Airplane Co. v. Firemen's Fund Indem. Co., supra.*

Considering the contracts between the parties as a whole with respect to fire insurance, we find no ambiguity warranting parol evidence. The court, we think, ruled correctly at the outset when it held that it would interpret the contract without resort to parol evidence. Conversely, we think the trial court erred when it considered this evidence in later holding the contracts to be ambiguous and applying parol evidence to explain them. As we quoted *Van Doren Roofing & Cornice Co. v. Guardian Cas. & Guar. Co.,* 99 Wash. 68, 168 P. 1124 (1917), in *Washington Fish & Oyster Co. v. G. P. Halferty & Co.,* 44 Wn.2d 646, 269 P.2d 806 (1954), at 658:

> "The rule is universal that the written contract itself must be resorted to as the source of authority for receiving parol evidence. Parol evidence is never admissible to create an ambiguity, but only to explain or remove an ambiguity apparent on the face of the instrument, or to identify a subject-matter otherwise uncertain."

*Accord: Fleetham v. Schneekloth,* 52 Wn.2d 176, 324 P.2d 429 (1958); *City Nat'l Bank of Anchorage v. Molitor,* 63 Wn.2d 737, 388 P.2d 936 (1964).

The insurance policy issued by defendant carriers to Gunther-Shirley-Lane and paid for by plaintiff prime contractor is, we think, in harmony with modification agreement No. 1. The policy—material terms of which are set forth in appendix B—covered all equipment and materials and work from the moment the insured's property became at risk of Gunther-Shirley-Lane or its subcontractors, *"including during process of unloading, until installation has been completed and accepted by the owner,"* and we find no ambiguity in that part of clause 5 of the policy which referred to Gunther-Shirley-Lane *or its subcontractors.* The reference to subcontractors merely contemplated that the defendant subcontractor might well subcontract parts of its contract and was being afforded full insurance protection for losses incurred during performance by its own subcontractors. Under the rules of construction earlier stated, we must give effect to the following language in clause 10 of the policy which exonerated any insurance

procured by Grant County Constructors that duplicated or overlapped the defendant's policy as to loss and damage incurred while the materials and equipment were at the risk of Gunther-Shirley-Lane:

> It is understood and agreed that any insurance carried or maintained by the prime contractor, Grant County Constructors, shall not be considered as "other insurance covering the property hereunder"; and any right of contribution or subrogation against the prime contractor or its insurance carriers is hereby waived.

The issue of whether the generator shaft was "at risk" of Gunther-Shirley-Lane is, therefore, to be resolved from the facts and circumstances of the loss and the language of the contracts without resort to parol evidence to show what the parties meant by defendant's policy of insurance and modification agreement No. 1. In the words of the policy, Was the damage incurred during process of unloading? Was the cutting of the tie-down a phase of Gunther-Shirley-Lane's operations in performance of its subcontract? Whether the shaft had become at the risk of Gunther-Shirley-Lane instead of remaining at the risk of Grant County Constructors or the railroad carrier or shipper depends, therefore, on whether Gunther-Shirley-Lane was unloading the shaft when the sisal paper caught fire.

The agreement of Grant County Constructors to provide whirley crane service for lifts of over 35 tons did not, we think, relieve defendant subcontractor of either its authority or its express contractual duties to "unload, transport, store and reload" the shaft, and there was nothing in the agreement or prior conduct of the parties to imply that, because the workman who cut the tie-downs was in the employ of Grant County Constructors, this relieved the subcontractor of the custody accorded it by the contract. When, after the flatcar carrying the generator shaft came to rest on the spur and remained there several days and Gunther-Shirley-Lane's representatives went aboard it, inspected the shaft, and made out a receiving report, they had assumed custody of it for purposes of unloading it. Cutting of the tie-downs was a part of the unloading proc-

ess. The parties had specifically agreed that risk of loss during unloading would fall on the defendant subcontractor and its insurance carriers, and the contract thus prescribed the ultimate responsibility.

Accordingly, liability here is not to be determined from tort law, nor tinctured with ideas of responsibility arising from a contract of indemnity, nor from infusions of respondeat superior or other forms of vicarious liability. The policy purchased by Gunther-Shirley-Lane and paid for by Grant County Constructors was not one of indemnity against liability for negligence or fault, but rather a coverage calling for reimbursement for loss or damage to the equipment occurring while the property was at the insured's risk. If, under the contract, Gunther-Shirley-Lane was on the risk, then the matter of whose employee wielded the torch in cutting the tie-downs is immaterial. Whether he was a borrowed servant or a temporary agent of Gunther-Shirley-Lane or agent of Grant County Constructors at the time he cut the tie-downs, he was engaged in the process of unloading the shaft during a time when it was in Gunther-Shirley-Lane's custody. Under the very narrow issues upon which liability rests here, his employment by Grant County Constructors would not affect the contractual responsibilities between insureds and insurance carriers in this case.

The written contracts, we think, established a clear and unambiguous undertaking—at least as clear as the English language ordinarily affords—that Gunther-Shirley-Lane was on the risk and assumed responsibility for the equipment upon accepting it at the railroad spur, and its risk continued thereafter throughout the process of unloading. Defendant subcontractor undertook to procure insurance at the prime contractor's expense to vindicate this responsibility. The insurance policy so procured dovetailed exactly with this declared responsibility, and it insured Gunther-Shirley-Lane "from the moment property insured becomes at risk of the contractor [Gunther-Shirley-Lane] . . . including during process of unloading" and by express

terms exonerated any insurance carried or maintained by the prime contractor, Grant County Constructors.

Although Grant County Constructors as prime contractor had a contractual right to board the flatcar and examine the generator shaft on its arrival at the railroad spur October 1, the defendant subcontractors had a contractual duty to unload it. When, 5 days after its arrival and 1 day after Gunther-Shirley-Lane had boarded the flatcar, the shaft was accidentally damaged by a fire caused by an acetylene torch being used during the process of cutting the metal tie-downs which secured the crate to the flatcar, the shaft was in the process of being unloaded and was then at the risk of defendant Gunther-Shirley-Lane.

The case is therefore reversed with directions to enter judgment for the plaintiffs in the sum of $208,200.

HUNTER, C. J., HILL and ROSELLINI, JJ., and COLE, J. Pro Tem., concur.

---

APPENDIX A

MORRISON-KNUDSEN COMPANY, INC.
Contractors and Engineers

Thomas L. Smith
    Attorney

Executive Office
319 Broadway, Boise, Idaho
November 6, 1959

Gunther-Shirley-Lane
Wanapum Powerhouse Joint Venture
P. O. Box 417
Palo Alto, California

Attention: Mr. W. W. Davis

Re: Wanapum Powerhouse Installation Subcontract
    Your File 81.24

Gentlemen:

Reference is made to your letter of October 30, 1959, addressed to Grant County Constructors and to our conference of November 3, 1959, concerning your responsibility for the protection of work, equipment and materials as set forth in your Subcontract of September 30, 1959, with Grant County Constructors and as clarified by Modification No. 1 to the Subcontract.

It is understood and agreed that you have undertaken full responsibility for the protection of all work, property, equipment and materials

entrusted to your custody from the time you take physical custody thereof until the time you are divested of physical custody or until such work, property, equipment and materials are completed and have been accepted by the Public Utility District. Likewise, we understand that you are obtaining insurance with a primary limit of $2,000,000 covering this responsibility.

In our several conversations, we understand that the insurance you are obtaining from Lloyd's of London will furnish primary protection to you with respect to any loss or damage to this property occasioned by your neglect or carelessness, and further, to any loss or damage occasioned by an act of God while this property is in your custody. We further understand that our Builder's Risk insurance policy shall not be affected by your coverage and that neither you nor the underwriters of the policy you are negotiating for your protection will make any claim against Grant County Constructors and the underwriters of its Builder's Risk insurance.

We understand, therefore, that the two pertinent conditions of the coverage you are arranging which are set forth in your letter of October 30, will not appear in the policy as written and will not apply, it being agreed that Grant County Constructors and Gunther-Shirley-Lane will each carry insurance for their respective accounts and not for the benefit of the other.

It is understood that you will furnish this office with a signed duplicate of your policy evidencing coverage of your responsibility for the protection of work and equipment under your Subcontract with Grant County Constructors. If this policy is acceptable in all respects to Grant County Constructors and to its Builder's Risk insurance underwriters, Grant County Constructors will pay to you the sum of $15,600 to cover your cost of securing this coverage.

Yours very truly,
Thomas L. Smith

TLS: as
cc: Mr. J. P. Shirley, Jr.
    Mr. Wm. G. Erving
    Mr. G. M. Shupe
    Mr. F. Hal Boettcher
    Grant County Constructors

## APPENDIX B.

The relevant paragraphs of the builder's risk policy are:

"1. INSURED: Gunther-Shirley-Lane Wanapum Powerhouse Joint Venture (Subcontractors)

"4. PROPERTY INSURED: This policy insures all materials and equipment and structures and appurtenant work to be used in connection therewith.

"Coverage under this policy is limited to the following job:

"Wanapum Development—Columbia River—for Grant County Public Utility District No. 2, Washington in connection with the installation of machinery and equipment to the powerhouse in accordance with

assured's subcontract dated September 30, 1959 running to Grant County Constructors.

"5. COMMENCEMENT AND DURATION OF RISK: Insurance hereunder attaches from the moment property insured becomes at risk of the contractor and/or their subcontractors including during process of unloading, until installation has been completed and accepted by the owner and the liability of the assured therefor shall cease, except as hereinafter limited or excluded.

"10. OTHER INSURANCE: If there is any other insurance covering the property insured hereunder, whether prior, subsequent to, or simultaneous with this insurance and by whomsoever effected, which in the absence of this insurance would cover loss or damage hereby covered, then this company shall not be liable hereunder for more than the excess over and above such other insurance; this company, nevertheless, guarantees the collection in full of the amount of loss which would have been recoverable hereunder in the absence of this clause and agrees to advance the amount as a loan without interest, repayable only in the event of recovery from such other insurance.

"It is understood and agreed that any insurance carried or maintained by the prime contractor, Grant County Constructors, shall not be considered as 'other insurance covering the property hereunder'; and any right of contribution or subrogation against the prime contractor or its insurance carriers is hereby waived."

February 9, 1970. Petition for rehearing denied.