[No. 2089-2.　Division Two.　April 16, 1976.]

JAMES J. CHERBERG, ET AL, *Respondents*, v. PEOPLES NATIONAL BANK OF WASHINGTON, *Defendant*, JOSHUA GREEN CORPORATION, *Appellant*.

*D. Gordon Willhite* (of *MacBride, Sax & MacIver*), for appellant.

*Lee Olwell* (of *Olwell, Boyle & Hattrup*), for respondents.

REED, J.—This is an appeal by defendant-lessor, Joshua Green Corporation, hereafter called lessor, from a judgment on a jury verdict rendered in favor of plaintiff-lessees, James J. and Arlene M. Cherberg, hereafter called Cherbergs, for an alleged failure to make repairs to a wall of the building in which the leased premises are located.

In 1967 Cherbergs leased from Seattle-First National Bank, a designated portion of the Lewis Building on Fifth Avenue in Seattle, Washington, and established therein a successful restaurant business. In 1972 the defendant-lessor acquired the building subject to plaintiffs' lease and one other. In April 1972, Peoples National Bank of Washington, owner of the property abutting to the south, commenced demolition of the Blue Mouse Theater located thereon, in order to construct a high-rise banking facility. This work resulted in exposing the south wall of the Lewis Building, revealing it to be structurally unsound and in need of substantial repairs in order to satisfy City of Seattle safety requirements.

The bank notified lessor who promptly wrote Cherbergs advising them in part that the city concurred with the bank's engineer's findings and that

They have concluded that the Lewis Building is structurally unsound and creates a hazard to the safety of the persons occupying the building. . . . We are advised by the Bank that the City is processing a letter which may require the abatement of the use of the property.

Shortly thereafter lessor's attorney wrote lessees enclosing a copy of a letter from the city concerning the need for repairs[1] and indicating lessor would probably elect not to make corrections in view of the age of the building, risks involved, and cost. Cherbergs countered that the lease agreement required lessor to make "structural repairs" and demanded it do so promptly, pointing out the lease did not expire until September 30, 1977, and that Cherbergs would suffer substantial damages if their tenancy should be interrupted.

The parties met on numerous occasions and exchanged considerable correspondence during which neither wavered in its position and the lessor eventually gave written notice of its election to terminate the lease and announced its intention to post safety warnings on the building. Cherbergs reacted by closing the restaurant for a period of 6 or 7 days. No notices were in fact posted and Cherbergs reopened, after learning from an independent consultant that repairs could be made to bring the wall into conformity with city requirements. They again indicated they expected lessor to make the repairs. In the interim, while the parties were negotiating, the bank agreed with lessor to leave in

---

[1]The letter, dated April 28, 1972, was directed to lessor and read in relevant part:

"We understand that you are the owner of the Lewis Hotel Building, located at the above noted address. [1425-29 5th Ave.]

"Recently, an inspection was made of this building by members of the Building Department of the City of Seattle. This inspection revealed that the south wall is not adequately anchored to the framing of the building and therefore is, in our opinion, considered unsafe.

"Please have your engineer inspect this building and submit the necessary corrections to this department for approval and permit."

place a portion of the theater wall in order to provide temporary support to the defective wall. In July 1972, however, the bank, not wishing to be delayed further in its construction plans, with consent of the lessor, repaired the wall at its own expense at a cost of $30,000 to $50,000.

It is undisputed that the lessor and the bank had mutual interests and that Joshua Green, lessor's president, was also a senior officer of the bank and a member of its board of directors. Neither is it disputed that it would have been highly advantageous to both lessor and the bank if the building could be razed. In fact, during February and March of 1972 the lessor, and thereafter until sometime in July 1972, the bank, employed a Mr. Tucker to negotiate for purchase of the Lewis Building tenancies. No agreement was reached through these negotiations, however, and they ended when the repairs were accomplished by the bank.

All negotiations having come to naught, plaintiffs brought suit in July 1972 seeking damages and injunctive relief against lessor and the bank alleging in one cause of action (1) a breach of lessor's duty to repair, (2) negligent damage to the wall during demolition, and (3) a conspiracy between defendants to destroy plaintiff's business. When all evidence was in, the trial court dismissed the bank and the negligence and conspiracy claims but instructed the jury that the lessor was liable for any damage proximately caused by its failure to make the needed repairs. Additionally, the court instructed on a theory of "willful misconduct," *i.e.*, the tort of intentional business interference. The evidence showed a loss of profits of approximately $3,100. The jury returned a general verdict in the sum of $42,000 with a special finding that the lessor acted willfully.

The lessor assigns error to denial of its motion for a directed verdict and the court's instructions on duty to repair, intentional tort, and damages. These assignments present the following issues: (1) Did the lessor have a duty to repair? (2) Did the lessor breach an implied covenant of quiet enjoyment? (3) Was it error to submit willful mis-

conduct—intentional business interference—to the jury and allow consideration of damages for inconvenience, discomfort, and mental anguish?

The pivotal issue before the trial court was whether the lessor had a duty to its tenant to make repairs to the wall in question. Cherbergs, contending the lease was ambiguous in this regard, offered the testimony of one Henry Wood, who negotiated the lease on behalf of the original lessor, Seattle-First National Bank, to prove the bank intended to assume that burden. Lessor objected to the admission of this testimony, contending the lease was not ambiguous, and clearly contained no express covenant by lessor to make such repairs. The trial court found the lease was ambiguous and ruled it would resolve the issue as a matter of law. The trial court then, however, sustained the objection to admission of the testimony but allowed it to be presented in an offer of proof. After all testimony was in, the court resolved the "ambiguity" against lessor, saying it was "taking into consideration the testimony of Mr. Wood." This was error for two reasons as we shall demonstrate.

■ First, an offer of proof serves to inform the trial court of the content and purport of the evidence sought to be admitted, and to preserve the record for appellate review when the exclusionary ruling is challenged. *Cf. McCarty v. Hagen*, 67 Wn.2d 434, 407 P.2d 953 (1965); *Cameron v. Boone*, 62 Wn.2d 420, 383 P.2d 277 (1963). Unless the court sees fit to change its ruling, the proffered evidence passes out of the case in the trial court and may not be considered for any purpose.

Secondly, we find no ambiguity in the lease before us which would permit recourse to parol testimony. The pertinent lease provisions are as follows:

(5) Unless otherwise provided in this lease, Lessee, having ascertained the physical condition of said premises from a careful and complete inspection thereof, accepts said premises in present condition, no exceptions. Lessee shall place, maintain and keep the leased premises, including the store front, if any, in good, neat and sanitary physical condition, and at Lessee's sole expense,

shall promptly make all repairs and do all acts and things necessary or incidental thereto; provided, however, that Lessee's said obligation shall not extend to the foundations, structural bearing parts, roof and outside walls of the premises unless repairs thereto or work thereon be necessitated by Lessee's act or negligence. . . .

. . .

(16) Lessee shall allow Lessor and Agent free access to said premises at all reasonable times for purpose of inspecting of the same or of making repairs, additions or alterations to said premises or to the building in which said premises are located *but this right shall not constitute or be construed as an agreement on the part of Lessor to make any repairs, which Lessee is required to make*, or to make any additions or alterations to said premises. . . .

(17) Unless otherwise provided in a rider to this lease, the use of the outside area of the walls and the roof of said premises or the building in which said premises are located, is reserved unto Lessor who shall have the right to utilize the same for any purposes desired including sign purposes; . . .

(Italics ours.)

█ Leases are contracts, as well as conveyances, and as such are to be given effect so as to carry out the intentions of the parties as manifested by the words used. *Allied Stores Corp. v. North West Bank*, 2 Wn. App. 778, 469 P.2d 993 (1970). It is not the province of the court to make a contract for the parties or impose duties where they do not exist. *Grant County Constructors v. E.V. Lane Corp.*, 77 Wn.2d 110, 459 P.2d 947 (1969). It is only when the intention of the parties cannot be deduced from the verbiage used that an ambiguity may be said to exist, justifying a resort to parol evidence. No ambiguity exists unless the language adopted by the parties is doubtful or is fairly susceptible to one of either of two meanings contended for. *Grant County Constructors v. E.V. Lane Corp., supra.*

█ Washington adheres to the common-law rule that, in the absence of an express covenant, the landlord is under no duty to make repairs to the demised premises, even if they become defective through decay or deteriora-

tion. *Conradi v. Arnold,* 34 Wn.2d 730, 209 P.2d 491 (1949); *Clarke v. Yukon Inv. Co.,* 83 Wash. 485, 145 P. 624 (1915); 49 Am. Jur. 2d *Landlord and Tenant* § 774 (1970); 1 *American Law of Property* § 3.78 (1952). Nor may such a covenant be raised by inference. *Cordes v. Guy Inv. Co.,* 146 Wash. 143, 262 P. 131 (1927).

■ In the lease before us it can readily be seen there is nothing rising to the stature of an express covenant by the lessor to make repairs to either the "demised premises" or the Lewis Building proper. On the contrary, by express provision the lessee is obliged to make all repairs to the "demised premises," except for foundation, structural bearing parts, roof, and outside walls. It is true the lessor has *reserved the right* to inspect and repair the demised premises. Without such a reservation or agreement it is questionable whether the lessor could enter to effect such repairs, even if it elected to do so, without being guilty of a trespass. 49 Am. Jur. 2d *Landlord and Tenant* § 227 (1970). Additionally, lessor has expressly reserved the *right to repair* the portions of the building not forming a part of the demised premises. Such a *reserved right* is far removed from an express undertaking to perform repair. We agree the language of paragraph (16) is somewhat curious, but it was obviously intended to stress the lack of any duty to make repairs, improvements, and additions and it would be a strained construction to forge what was clearly intended as a shield into a sword. In *Refrigeration for Science Inc., v. Deacon Realty Corp.,* 70 Misc. 2d 500, 334 N.Y.S.2d 418 (1972), the court interpreted similar language as imposing no duty on either lessor or lessee to make major structural repairs to foundation and walls, saying at page 507:

> The difficulty is that the lease contains no express covenant by the landlord to make structural repairs. "A landlord's obligation to repair in any case rests solely on express covenant. Without an express undertaking to repair the demised premises, the lessor is neither bound to do so himself nor to pay for repairs made by the tenant" . . . Nor is plaintiff aided by the clauses of the lease granting the landlord permission to enter upon the prem-

ises "for the purpose of examining the same, or making such repairs or alterations therein as may be necessary for the preservation and safety thereof" and to remove signs when necessary to do so for painting and related purposes. *Such clauses do not impose on the landlord the duty to make repairs; they "simply give[s] permission to the landlord to inspect his premises and make such repairs as are necessary. It creates no duty upon him so to do, and the tenant could not require it to be done"* . . .

(Citations omitted. Italics ours.)

The trial court erred, therefore, in considering the testimony of Mr. Wood and in finding a lease-imposed duty by lessor to repair.

■■ We next consider whether, as contended by Cherbergs, the lessor's failure to make immediate repairs and other actions taken by it after notification from the city, breached an implied covenant of quiet enjoyment and resulted in a constructive eviction. The lease agreement contains no express covenant of quiet enjoyment but it is well settled that such a covenant arises by implication and inheres in every lease unless negated by express provision. *Washington Chocolate Co. v. Kent*, 28 Wn.2d 448, 183 P.2d 514 (1947); 1 *American Law of Property* § 3.47 (1952); 49 Am. Jur. 2d *Landlord and Tenant* § 330 (1970); Annot., 41 A.L.R.2d 1414 (1955).

Such a covenant secures the tenant from any wrongful act by the lessor which impairs the character and value of the leased premises or otherwise interferes with the tenant's quiet and peaceable use and enjoyment thereof. Acts or omissions of the lessor render it liable however only when it has breached an underlying duty which results in an invasion of the interests secured. *Washington Chocolate Co. v. Kent, supra.* As we have demonstrated there was no express or implied duty to repair arising from the lease itself and a failure to repair would not therefore be a wrongful act such as would constitute a breach of the covenant of quiet enjoyment. *Ripps v. Kline*, 70 Nev. 510, 275 P.2d 381 (1954).

█ An independent duty to repair, wholly apart from the lease covenants, may arise when, in the interest of public health, safety, and welfare, repairs are required by statute or mandated by competent government authority. 1 *American Law of Property* § 3.80 (1952); Annot., 22 A.L.R.3d 521 (1968). In the instant case the wall in question was not a part of the "demised premises" and was within the complete control of the lessor. The responsibility for any repairs, additions, or alterations which might be ordered by competent governmental authority was that of the lessor under these circumstances. The City of Seattle had notified lessor the wall was not safe and that "necessary corrections" should be submitted for approval. The evidence presented supports a conclusion that the integrity and safety of the entire building, including the leased premises, depended upon the condition of the wall. It is true the city did not issue any formal order that the repairs be accomplished within any certain time period. Nor does the record reveal the avenues of enforcement available to the city should lessor fail to comply. Those remedies could conceivably involve criminal prosecution, posting and closure, or, as a last resort, demolition of the nonconforming building.

Had the lessor allowed the matter to progress to the point where it could argue it might have elected to demolish rather than repair, the instant case might present a more difficult problem. Cases involving such a dilemma usually turn on construction of the governmental edict. The majority hold that where the lessor is given no choice and must demolish, by doing so it has neither breached a duty nor voluntarily committed an act in violation of the covenant of quiet enjoyment. *Ripps v. Kline, supra*; *Goldring v. Kline*, 71 Nev. 181, 284 P.2d 374 (1955); Annot., 22 A.L.R.3d 521 (1968). On the other hand, when repairs only are ordered or the lessor is given the alternative to either repair or demolish, the better reasoned decisions treat an election to demolish as a voluntary act breaching the covenant of quiet enjoyment. *Burofsky v. Turner*, 274 Mass. 574, 175

N.E. 90 (1931); *Lindwall v. May*, 111 App. Div. 457, 97 N.Y.S. 821 (1906); *cf. Ripps v. Kline, supra; Goldring v. Kline, supra.* Here the evidence supports the one conclusion that the lessor fastened upon the city's notice as a means of escaping from the Cherbergs' lease. It chose to treat the letter as some sort of mandate when it advised Cherbergs the whole building was deemed unsafe and that the city was considering abatement. By so doing and by attempting to terminate the lease and threatening to post notices warning potential customers of the hazard, the lessor effectively forced its tenant to close down its business and temporarily vacate the leased premises. In our view, these actions, coupled with the delays in making the repairs required by the city, constituted a breach of the lessor's covenant of quiet enjoyment and amply support the trial court's determination that, as a matter of law, lessor was liable for any damages stemming from such breach and to so instruct the jury.

We turn finally to the propriety of submitting to the jury the intentional tort of business interference or willful misconduct. Upon conclusion of all the evidence and after the bank had been dismissed with all claims against either defendant for conspiracy, the trial court denied lessor's challenge to the sufficiency of the evidence and its motion for a directed verdict on the claim of willful misconduct or intentional business interference. In doing so, the court announced it would instruct the jury on the elements of that tort as they appeared in the case of *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964).

The actual instructions given, which we need not set forth herein, did not in fact relate to the tort of business interference discussed in *Calbom*, which deals with unprivileged intermeddling in the contractual affairs of third persons. Nor should they have, because one cannot be guilty of the separate tort of interfering with one's own contract. *Hein v. Chrysler Corp.*, 45 Wn.2d 586, 277 P.2d 708 (1954); Restatement of Torts § 766 (1939). In *N.A. Berwin & Co. v. American Safety Razor Corp.*, 108 N.Y.S.2d 677

(Sup. Ct. 1951), in dismissing just such a claim the court quotes with approval *Miller v. Vanderlip*, 285 N.Y. 116, 33 N.E.2d 51, 56 (1941):

> "Although the plaintiff may have a cause of action for interference with his contract rights, on the part of the person not named in the first cause of action, plaintiff himself apparently does not so construe the second cause of action. Instead, when fairly read and as construed by plaintiff, the second cause of action seeks to restate as a conspiracy that which amounts to nothing more than the breach of contract alleged in the first cause of action. The second cause of action adds nothing by way of legal liability, and only seeks to explain the possible motives of defendants for their failure to perform the agreements sued upon in the first cause of action. Since plaintiff's cause of action for breach of contract is his entire grievance against the defendants he may not split his causes of action based upon a single grievance and, therefore, the second cause is bad and should be dismissed."

*N.A. Berwin & Co. v. American Safety Razor Corp., supra* at 679.

And, as stated in *Sax v. Sommers*, 108 N.Y.S.2d 467 (Sup. Ct. 1951) at page 468:

> Thus, as to the defendants, Sommers and Pitts, conspiracy on their part to breach their own contract obligations would not constitute a cause of action. The theory appears to be that the damages properly recoverable are those flowing from the breach and additional recovery, as for a tort, in the nature of punitive damages, is not permissible.

▮ The instructions given did, however, inform the jury it could award additional damages for inconvenience, discomfort, and mental anguish if it found lessor's actions were willful. This, too, was error for the reasons stated in *Berwin* and *Sax* because to award such damages for a lessor's breach of covenant would be to allow punitive or exemplary damages, a result long since not countenanced in this state. *Barnes v. Bickle*, 111 Wash. 133, 189 P. 998 (1920); *Risdon v. Hotel Savoy Co.*, 99 Wash. 616, 170 P. 146 (1918).

Thus, the evidence and all reasonable inferences therefrom would not support submission of these last two theories to the jury, and lessor's *motion for a directed verdict as to these theories should have been granted.*[2]

The defendant invites us to remand for entry of judgment in the sum of $3,100 should we find adversely to it on the issue of breach of duty to repair. Because the verdict is general, however, we are unable to segregate the damages awarded. Accordingly, we reverse and remand for dismissal with prejudice of all claims for willful misconduct or business interference and for a new trial unless plaintiff consents to entry of judgment in its favor in the sum of $3,100 within 30 days of the going down of the remittitur herein.

PETRIE, C.J., and PEARSON, J., concur.

Petition for rehearing denied May 24, 1976.

Review granted by Supreme Court October 5, 1976.

---

[2]Cherbergs argue here that any error in submission of willful misconduct or business interference was not preserved because lessor's exceptions to the instructions were not sufficiently specific under *Dravo Corp. v. L.W. Moses Co.*, 6 Wn. App. 74, 492 P.2d 1058 (1971). We disagree for the reasons stated in *Rhoades v. DeRosier*, 14 Wn. App. 946, 948 n.2, 546 P.2d 930 (1976), which reads in part:

> While instructions to which no exception is taken become the law of the case, the doctrine does not bar review of the granting or denial of a directed verdict. Whether a verdict should have been directed is a question of law, and its resolution is not controlled by the pronouncements of the instructions, but by the *applicable* law. The standard to be applied is the same whether the issue is raised by way of a motion for a directed verdict or a motion for judgment notwithstanding the verdict. A timely motion for a directed verdict and its subsequent denial preserves the issue for review. . . .

> The failure to object to instructions does not, therefore, preclude an appellate consideration of a trial court's denial of a motion for a directed verdict.